378 F.3d 269
 Gary H. RAMEY; Dean R. Droz; Euclides Paim; Dennis J. Seath; Ryan T. Abdool; Thomas P. O'Grady; Joseph R. Cummings; Anthony Grginovich; Peter T. Ehrling; Martin Higgins; Joseph Pescatore; John I. Rudic; Rocco F. Salerno; Michael J. Dunne; Garry Hagstrom; Michael A. Pitelli; John Mcardle; Thomas J. Eng; William
Moskowitz; Michael J. Andrews; Laszlo Mayer; Wayne P. Feuerherm; Michael Frim; Charles Morro; John Untisz; Raymond J. Simuta; James M. Lowe; Jack K. Grimes; David R. Hill; John W. Lane; Stephen R. Cunningham; Alan W. Cockerham; Gerald W. Davidson; Allen D. Hilton; Eric J. Stoffer; Glenn R. Pigg; Christopher A. Koberg; Robert L. England; Edward S. Moore; Richard Shimkus; Richard Alluzio; Ernest J. Angelosanto; James L. Barnes; Normand J. Castonguay; Lloyd Cheney; Michael Chesna; Robert P. Clinton; Ronald E. Coffin; John H. Corkery, III; John N. D'Angelo; Kenneth C. Danisevich; Elvio Delise; Ronald A. Fraser; Joseph J. Harrington; Joseph R. Huard; Ralph L. Imbriano; Herbert L. Johnson, Jr.; Peter D. Lawrence; Robert Lewis; Paul Lewis; Donald E. Loeber; Joseph McGrath; William A. Morgan; George A. Nichols; Edwin F. Parsons, Jr. and Robert E. Smith, Jr., Plaintiffs-Appellees,
v.
DISTRICT 141, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS and International Association of Machinists and Aerospace Workers, AFL-CIO, Defendants-Appellants,
Kenneth Thiede, in his capacity as President and General Chairman of District 141, International Association of Machinists and Aerospace Workers; David Snyder a/k/a David "Duke" Snyder, in his capacity as Assistant General Chairman, District 141, International Association of Machinists and Aerospace Workers; US Airways Group, Inc.; US Air, Inc., a/k/a U.S. Airways, Inc.; Shuttle, Inc. and John and Jane Does 1-20, Defendants.
 Docket No. 03-7798.
 United States Court of Appeals, Second Circuit.
 Argued December 18, 2003.
 Decided August 10, 2004.
 
 Appeal from the United States District Court for the Eastern District of New York, Edward R. Korman, Chief Judge. COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Jeffrey A. Bartos, Washington, DC (Joseph Guerrieri, Jr., Guerrieri, Edmond & Clayman, Washington, DC, of counsel), for Appellants.
 Eric M. Nelson, New York City, for Appellees.
 Before: MESKILL, POOLER and SOTOMAYOR, Circuit Judges.
 MESKILL, Circuit Judge.
 
 
 1
 A group of plaintiffs sued their labor union in the United States District Court for the Eastern District of New York, Korman, J., alleging that the union breached its duty of fair representation. A jury found for the plaintiffs, and the union's motions for judgment as a matter of law and for a new trial were denied. The union appealed, and we affirm.
 
 BACKGROUND
 
 2
 Plaintiffs are airline mechanics currently employed by U.S. Airways, Inc. (USAir). They were formerly employed by Eastern Airlines (Eastern). Plaintiffs have sued their labor union, the International Association of Machinists and Aerospace Workers, their local, District 141, and various union officials. For the sake of simplicity, we refer to defendants collectively as IAM.
 
 
 3
 In early 1988, while plaintiffs were employed by Eastern and represented by IAM, Eastern and the Trump Organization (Trump) announced plans for a sale of the Eastern Shuttle operation, a regional airline service, to Trump. Under the terms of the proposed sale, Trump would acquire the entire Eastern Shuttle operation, including planes, routes, landing slots and equipment. Additionally, various Eastern employees would be offered the opportunity to become employees of Trump and operate the new airline, Trump Shuttle. The sale was completed, and plaintiffs accepted the offer to work for Trump Shuttle. In March 1989, shortly after the sale went through, Eastern declared bankruptcy. During the course of the bankruptcy proceedings, IAM took the position that plaintiffs should be viewed as having "transitioned" from Eastern to Trump Shuttle, rather than having resigned from Eastern and subsequently hired by Trump Shuttle.
 
 
 4
 While employed by Trump Shuttle, plaintiffs grew frustrated with IAM's representation. Consequently, in 1990 they voted out IAM as their labor union and voted instead to be represented by the Aircraft Mechanics Fraternal Association (AMFA). In 1992, as a result of Trump Shuttle's financial difficulties, a consortium of banks took control of the airline and renamed it Shuttle, Inc. (Shuttle). Almost immediately thereafter, Shuttle entered into an agreement with USAir by which USAir would manage Shuttle's operations. This agreement also provided USAir with an option to purchase Shuttle within five years.
 
 
 5
 In August 1992, the National Mediation Board (NMB) granted USAir "single carrier status" for the purposes of collective bargaining. As a result, AMFA ceased to represent plaintiffs, and IAM, which represented the USAir mechanics, resumed its position as plaintiffs' collective bargaining representative.
 
 
 6
 Shortly afterward, so-called "mainline" USAir mechanics — those employed by USAir rather than Shuttle — went on strike. Plaintiffs were unsure whether they should join the strike. On the one hand, their previous collective bargaining agreement, which appeared to remain in effect despite USAir's assumption of control of Shuttle, included a no-strike clause that could cause them to lose their jobs if they joined in a strike. On the other hand, they were now a part of the same local as their co-workers at USAir, and there was some suggestion that their previous collective bargaining agreement was extinguished, which would free them to join the mainline strike. In the end, they opted not to join in the strike.
 
 
 7
 In late 1992 or early 1993, IAM and USAir commenced negotiations concerning the integration of plaintiffs into the mainline workforce. The effect of integration would be to include plaintiffs under the same collective bargaining agreement as the mainline employees. This was attractive to plaintiffs because it offered the prospect of higher pay and better benefits.
 
 
 8
 The integration, or "mainlining," process required USAir and IAM to come to an agreement as to how plaintiffs' seniority status would be calculated with respect to their peers in the mainline workforce. IAM has a longstanding policy of "dovetailing" seniority lists, which involves blending the two employee groups based on their pre-merger employment dates at each of the merging airlines. In applying this policy to plaintiffs, IAM had to decide what it would consider to be plaintiffs' start dates at Shuttle. Plaintiffs felt that IAM should apply their Eastern start dates because they viewed their move from Eastern to Trump Shuttle as a "transfer." IAM, however, argued that plaintiffs resigned from Eastern prior to accepting employment at Trump Shuttle and, therefore, they should only be accorded seniority classification from their start-dates at Trump Shuttle.
 
 
 9
 Plaintiffs vigorously opposed IAM's preferred position and retained Attorney Lee Seham to advocate on their behalf to IAM. Plaintiffs believed that IAM had taken this position to punish them for voting for AMFA during their brief period at Trump Shuttle and for refusing to join the mainline strike when Shuttle was taken over by USAir. Seham was unsuccessful in persuading IAM to reconsider its position. IAM subsequently presented its position to USAir. Before an agreement could be reached, however, USAir decided not to proceed with the mainlining and announced that it would not integrate the two employee groups unless and until it decided to exercise its five-year option to purchase Shuttle. Therefore, the seniority issue receded into the background and plaintiffs continued to work for USAir under a separate collective bargaining agreement.
 
 
 10
 In late 1997, USAir decided to exercise its option and, in March 1998, it announced its intention to integrate the two workforces. However, in July 1998, IAM announced that, based on preliminary discussions, it appeared that USAir would not proceed with integration "in the immediate future." Subsequently, in December 1998, plaintiffs received a memo from IAM explaining that IAM would once again take the position during negotiations that plaintiffs' Eastern seniority should not be applied. It is not clear from the record precisely when negotiations between USAir and IAM formally commenced or when plaintiffs learned of their commencement. In May 1999, USAir agreed to IAM's terms.
 
 
 11
 In late July 1999, plaintiffs instituted this action in the United States District Court for the Eastern District of New York, Korman, J., and alleged that IAM breached the duty of fair representation it owed them under the Railway Labor Act, 45 U.S.C. § 151 et seq., by failing to accord them their Eastern seniority.[1] They maintained that IAM punished them for having chosen AMFA over IAM and for opting not to participate in the mainline mechanics' strike in 1992. IAM moved for summary judgment on various grounds, including that (1) it did not breach its duty because its position was objectively reasonable, (2) the statute of limitations had lapsed before plaintiffs instituted the action, and (3) plaintiffs had insufficient evidence to prove that IAM was motivated by hostility or animus toward plaintiffs. Judge Korman denied the motion, Ramey v. District 141, 2002 WL 32152292, 2002 U.S. Dist. LEXIS 26670 (E.D.N.Y. Nov. 4, 2002), and the case proceeded to trial.
 
 
 12
 IAM argued to the jury that its seniority decision was reasonable because plaintiffs had resigned from Eastern before they were hired by Trump Shuttle and, therefore, they were not entitled to their Eastern seniority. However, plaintiffs showed that IAM had taken the position during the Eastern bankruptcy proceeding that plaintiffs were to be viewed not as having resigned from Eastern, but rather as having "transitioned" from Eastern to Trump. Plaintiffs also elicited testimony to the effect that IAM officials were hostile toward AMFA and those associated with it.
 
 
 13
 The jury found in favor of plaintiffs, concluding that IAM breached its duty because it had stripped plaintiffs of their seniority out of animus. In particular, the jury found that, had IAM not been hostile toward plaintiffs as a result of their decision to be represented by AMFA, IAM would have sided with them on the seniority issue.
 
 
 14
 IAM moved for judgment as a matter of law and for a new trial, essentially renewing the arguments it had made in the summary judgment motion. Judge Korman denied the motion and entered judgment against IAM. The judgment included an injunction requiring IAM to negotiate with USAir to amend the seniority roster and provide plaintiffs with their Eastern start dates. In addition, because some plaintiffs had been furloughed by USAir as a result of their relatively lower start dates, the injunction requires IAM to request that USAir restore these plaintiffs to work.
 
 
 15
 This appeal followed.
 
 DISCUSSION
 
 16
 IAM asserts various grounds for its appeal. First, it argues that its conduct was objectively reasonable and, thus, it did not violate its duty of fair representation. Second, it maintains that the applicable statute of limitations period had expired before plaintiffs brought this case. Third, IAM contends that Judge Korman made two erroneous evidentiary rulings during the course of the trial that merit reversal. Fourth, it challenges the jury's verdict on the ground that the verdict was not supported by sufficient evidence. Finally, IAM argues that it is entitled to judgment against any plaintiff who did not personally testify to establish damages. We reject each of these arguments in turn.
 
 I. IAM's Challenge to the Jury's Verdict
 
 17
 IAM maintains, as it did below, that the judgment should be overturned because, despite the jury's finding that IAM's seniority decision was motivated by animus, there was an independent rational basis supporting its decision; namely, that they had resigned from Eastern. In other words, IAM contends that because an objective union, albeit one with different policies, could have reasonably denied plaintiffs their Eastern seniority, IAM should be immune from suit here even though it had been motivated by animus toward plaintiffs as a result of their having favored AMFA.[2] We do not agree.
 
 
 18
 "The statutory duty of fair representation was developed [decades] ago." Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). "[A] union breaches [this] duty... when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 44, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998). Put differently, a breach occurs when a union fails to "serve the interests of all members without hostility or discrimination toward any, [] exercise its discretion with complete good faith and honesty, [or] avoid arbitrary conduct." Vaca, 386 U.S. at 177, 87 S.Ct. 903. "[A] union may not, without a legitimate purpose, take action favoring some of its members at the expense of others." Teamsters Local Union No. 42 v. NLRB, 825 F.2d 608, 611 (1st Cir.1987) (citing Laborers and Hod Carriers Local No. 341 v. NLRB, 564 F.2d 834, 840 (9th Cir.1977); Barton Brands, Ltd. v. NLRB, 529 F.2d 793, 800 (7th Cir.1976)). Additionally, "a union violates [its duty] when it causes an employer to discriminate against employees on arbitrary, hostile, or bad faith grounds." Barton Brands, 529 F.2d at 799.
 
 
 19
 Although our review of a union's collective bargaining "must be highly deferential [and must] recogniz[e] the wide latitude that [unions] need for the effective performance of their bargaining responsibilities," Air Line Pilots Association v. O'Neill, 499 U.S. 65, 78, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), "a union may not juggle the seniority roster for no reason other than to advance one group of employees over another" or to punish a disfavored group, Rakestraw v. United Airlines, 981 F.2d 1524, 1535 (7th Cir.1992); see also Teamsters Local Union No. 42, 825 F.2d at 612 ("[W]hen a union attempts to prefer [one group of] workers based solely on [their loyalty to their guild]," it has breached its duty.). Finally, a union is not permitted to ignore its own policies to punish a minority group within the union. Nellis v. Air Line Pilots Association, 815 F.Supp. 1522, 1533 (E.D.Va.1993) ("A union is bound to follow its [own] policies."), aff'd, 15 F.3d 50 (4th Cir.1994).
 
 
 20
 The jury found that IAM violated these principles. Rather than treating plaintiffs as having transitioned from Eastern — a policy IAM announced in the Eastern bankruptcy proceeding — IAM instead opted to treat them as having resigned in order to strip them of their seniority status for no reason other than animus.
 
 
 21
 IAM seeks support for its position in the Seventh Circuit's Rakestraw decision. In Rakestraw, the court held that union members could not sue their union for dovetailing merger lists even though the union's decision to dovetail contradicted its own policy of arbitrating such disputes. 981 F.2d at 1527, 1533. Judge Easterbrook, writing for the court, held that because "[a] rational person could conclude that dovetailing seniority lists in a merger ... serves the interests of [the union membership] as a whole," id. at 1533, doing so could not constitute a breach of the duty of fair representation.
 
 
 22
 Even assuming we were to adopt this rule, we cannot see how it supports IAM's position. Unlike in Rakestraw, plaintiffs here do not suggest that IAM acted improperly merely by dovetailing the seniority lists. Rather, they argue that IAM was motivated by retaliatory animus in choosing which seniority dates to apply. The jury held, in effect, that IAM revoked plaintiffs' seniority because it was hostile toward them as a result of their association with AMFA. This, of course, is not objectively reasonable. In ignoring its own position regarding plaintiffs' status simply to punish them, IAM breached its duty of fair representation.
 
 II. The Statute of Limitations
 
 23
 IAM next renews its claim, made below, that the statute of limitations had run before plaintiffs instituted this action on July 28, 1999. The parties agree that a six month statute of limitations governs this case. They disagree, however, on the date plaintiffs' cause of action accrued. IAM argues that the statute of limitations began to run, at the very latest, on December 14, 1998, and, as a result, the suit is time-barred. Plaintiffs counter that the cause of action accrued no earlier than January 28, 1999, and therefore their suit is timely.
 
 
 24
 For more than twenty years we have consistently held that, in a suit alleging a breach of the duty of fair representation brought by union members against their union, "the cause of action accrue[s] no later than the time when [the union members] knew or reasonably should have known that ... a breach ha[s] occurred." Santos v. District Council of New York City, 619 F.2d 963, 969 (2d Cir.1980); see also Buttry v. General Signal Corp., 68 F.3d 1488, 1492 (2d Cir.1995) (same); Flanigan v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen & Helpers of America, 942 F.2d 824, 827 (2d Cir.1991) (same); Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 165 (2d Cir.1989) (same). Applying this standard to this case, we conclude that the cause of action did not accrue prior to January 28, 1999, and therefore this action was timely filed.
 
 
 25
 IAM initially suggests that the cause of action accrued in 1993 when it announced its position that plaintiffs would not be credited with their Eastern seniority. This argument borders on the absurd because, although we have held that the harm that results from the union's breach need not be beyond all doubt for a cause of action to accrue, see, e.g., Buttry, 68 F.3d at 1492-93 (holding that cause of action accrued when union manifestly abandoned the interests of its members), we cannot accept IAM's contention that the statute of limitations runs even in the face of substantial doubt as to the likelihood of an ensuing harm. When USAir announced that it would not proceed with the mainlining of the Shuttle employees until it decided at the end of five years whether to exercise its option to purchase, Shuttle plaintiffs were given ample reason to question whether they would ever be harmed by IAM's 1993 decision. Indeed, they would have had no idea whether USAir would exercise its option and, if so, whether and how USAir would move forward with mainlining. Moreover, any suit filed in 1993 would have been based on conjecture as to whether IAM's position might change during the intervening time period. Faced with these facts, any district court would have been obligated to dismiss as premature a suit brought in 1993 because we do not permit speculative claims. United States v. Fell, 360 F.3d 135, 139 (2d Cir.2004) (Federal courts may not "entangl[e themselves] in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur.") (internal quotation marks and citation omitted). Thus, plaintiffs' cause of action did not accrue in 1993.
 
 
 26
 IAM argues in the alternative that the cause of action accrued no later than December 1998 when it sent a memorandum to all union members, including plaintiffs, announcing that mainlining would proceed and that IAM would "take the position [during negotiations with USAir] that [plaintiffs would be] entitled to seniority on USAirways from their date of hire on Trump Shuttle [rather than from their date of hire on Eastern]."
 
 
 27
 As we stated, it now is well settled that the determination of the date of accrual turns on whether "plaintiffs knew or reasonably should have known that ... a breach had occurred." Santos, 619 F.2d at 969 (emphasis added). We have never held that a breach occurs when a union announces an intention, even if it does so unequivocally, to advocate against the interests of its members in the future. Rather, we have held that the breach occurs when the union acts against the interests of its members. To hold otherwise would invite plaintiffs to sue whenever a union official announces a position with which they disagree. This runs counter to our general policy favoring internal resolution of labor disputes (as long as the disputes in question remain internal), Ghartey, 869 F.2d at 164 (citing policy favoring "non-judicial resolution of labor disputes"), and would needlessly clog our court system with litigation over whether a union's position is "final enough" to establish a cause of action. Further, requiring union members to sue whenever a union representative announces plans with which they disagree would put the members in the difficult position of being in an adversarial position against their union — the very same union that simultaneously must represent their interests.[3] Childs v. Pennsylvania Federation Bhd. of Maintenance Way Employees, 831 F.2d 429, 435 (3d Cir.1987) (noting the danger associated with filing a lawsuit of antagonizing a union that must continue to represent a plaintiff's interests). For these reasons, we do not require, or even permit, union members to bring a suit against their union simply because the union has announced its future intention to breach its duty.[4]
 
 
 28
 We find further support for our conclusion in well settled principles of contract law. The duty of fair representation owed by a union to its members is similar to a contractual duty, and the union's announcement of its intent to advocate against its members' interests may be compared to a party's anticipatory repudiation of a contractual duty. In some anticipatory repudiation cases the aggrieved party may sue immediately after the repudiation is announced. However, the statute of limitations ordinarily does not begin to run, and the cause of action does not accrue, until the date of the actual breach; that is, until the date on which performance is due. See Franconia Assoc. v. United States, 536 U.S. 129, 144, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) ("[T]he time of accrual ... depends on whether the injured party chooses to treat the ... [anticipatory] repudiation as a present breach.... [I]f the injured party instead opts to await performance, the cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier date of repudiation.") (internal quotations marks and citations omitted); Kinsey v. United States, 852 F.2d 556, 558 (Fed.Cir.1988) ("[T]he normal rule is that the statute of limitations begins to run from the date of performance... unless the obligee elects to sue earlier for anticipatory breach."); Cary Oil Co. v. MG Refining and Marketing, 90 F.Supp.2d 401, 412 (S.D.N.Y.2000) ("[T]he statute of limitations for failure to perform [does] not begin to run [even in the case of an anticipatory breach] until the time fixed for performance. The UCC appears to have adopted this approach.").
 
 
 29
 Applying this principle to the case at bar, the cause of action accrued on the date on which performance was due, namely the date on which IAM advocated a position on the seniority issue to USAir. The December 1998 memorandum did not inform plaintiffs that a breach already had occurred. At best, it informed plaintiffs that IAM intended to breach on some unspecified future date. As such, it alone could not have triggered the statute of limitations. Indeed, we cannot determine from the record precisely when negotiations between IAM and USAir on the seniority issue began, let alone when plaintiffs first learned that such negotiations had begun and that IAM had taken an adversarial position. In sum, there is nothing to suggest that plaintiffs should have known prior to January 28, 1999 that negotiations had begun and a breach occurred. This action was instituted within six months of that date. Therefore, it was timely.[5]
 
 III. IAM's Challenges to Evidentiary Rulings
 
 30
 IAM also argues that the judge made two erroneous evidentiary rulings that require reversal or a new trial. First, IAM maintains that the judge improperly precluded cross-examination of a witness regarding a key element of plaintiffs' case. Second, it contends that the judge abused his discretion in permitting the testimony of an attorney who previously had represented plaintiffs. We reject both arguments.
 
 
 31
 1. Judge Korman's Limitation of Cross-Examination
 
 
 32
 Plaintiffs' first witness was Raymond Grebey, a former Trump official. Through Mr. Grebey, plaintiffs introduced a legal memorandum from 1991 that was filed in the Eastern bankruptcy proceeding. The memorandum demonstrated that IAM had, at the time of the bankruptcy proceeding, taken the position that plaintiffs should be treated as "transitional employees" from Eastern to Trump, rather than as "typically resigning employees." This evidence was crucial to plaintiffs' case because it undermined IAM's position at trial that a key consideration in reaching its seniority decision was that plaintiffs had resigned from their positions at Eastern before becoming Trump employees, resulting in the loss of their Eastern seniority status. In other words, plaintiffs used this evidence to argue that IAM's position at trial was pretextual. The jury's verdict suggests that this evidence had that effect.
 
 
 33
 On cross-examination, IAM's counsel questioned Grebey about the proceedings in bankruptcy court. In particular, counsel elicited from Grebey that the bankruptcy judge had rejected IAM's position that plaintiffs should be considered as "transitional employees" and instead ruled that they were to be considered as resigning employees. Before counsel could proceed further with this line of questioning, Judge Korman addressed the jury and stated that "[t]he [only] relevance of [the 1991 legal memorandum introduced by plaintiffs] is... for what was represented by [IAM] ... and the position [IAM] took [with respect to the proper classification of plaintiffs]. Whatever happened in the bankruptcy court is otherwise irrelevant." The judge thus prohibited further questioning regarding the bankruptcy proceedings.
 
 
 34
 On appeal, IAM argues that this ruling constituted reversible error because the judge wrongly excluded relevant evidence. IAM maintains that the outcome of the bankruptcy proceeding was directly relevant to issues central to the case. According to IAM, it intended to argue to the jury that although it had sided with plaintiffs in the bankruptcy proceedings on the issue of whether they were to be considered as having resigned or merely "transitioned," IAM was forced to reevaluate its position in light of the bankruptcy judge's ruling that plaintiffs were to be treated as "resigning" employees for the purposes of the bankruptcy proceeding. In other words, IAM wanted to argue that although it had changed its position, it had done so reasonably and not out of malice or animus towards plaintiffs.
 
 
 35
 An evidentiary ruling is reversible if it constitutes an abuse of discretion and affects a party's substantial rights. Schering Corp. v. Pfizer, 189 F.3d 218, 224 (2d Cir.1999). However, "a party seeking to preserve an objection to the [district] court's ruling [on an evidentiary issue] must `mak[e] known to the court ... the party's objection to the action of the court and the grounds therefor.'" Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 174, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (quoting Fed.R.Civ.P. 46).
 
 
 36
 We do not require trial counsel to provide a detailed explanation of the basis for an objection to an evidentiary ruling "in the heat of a trial." We require only that the court be "put[]... on notice" of the party's concern and the basis therefor. Id. In this case, however, IAM's counsel did not make even the barest attempt to preserve the issue for appeal. No objection or counter-argument was made when the judge ruled the evidence in question to be inadmissible. Counsel never explained to the judge his purpose in eliciting this testimony, and his purpose was by no means clear from the questions. Judge Korman may well have thought that defense counsel meant to imply to the jury that the position taken by IAM during the bankruptcy proceeding was somehow "wrong" as a matter of law and that IAM was therefore required by law to adopt the position that plaintiffs had retired from Eastern. If this had been the purpose of the elicited testimony, then the district judge surely was correct in excluding it as irrelevant to the issues in the case. Defense counsel failed to articulate that he intended to introduce the bankruptcy ruling only to explain to the jury why IAM's change in position was reasonable. We therefore cannot find that the judge was put on notice as to the purpose of IAM's objection to his ruling. Accordingly, we will not entertain this challenge to the judge's evidentiary ruling.
 
 
 37
 2. The Testimony of Plaintiffs' Former Attorney
 
 
 38
 During the course of the trial, plaintiffs called Mr. Lee Seham to testify. From approximately 1991 through at least the time of trial, Seham was an attorney who represented AMFA. In 1993, when negotiations concerning mainlining originally took place, Seham represented plaintiffs and wrote a number of letters to IAM and USAir in which he argued that plaintiffs were entitled to their Eastern seniority. Some of the letters threatened litigation, but Seham never filed a case on behalf of plaintiffs, perhaps because it became clear that mainlining would not take place in 1993. It is undisputed that since 1993, Seham never has performed further work for plaintiffs or represented them in any capacity.
 
 
 39
 The substance of Seham's testimony at trial was that he had been subject to hostility and animus from IAM as a result of his representation of AMFA. Seham testified that beginning roughly in 1991, IAM officials repeatedly and publicly accused him of being a liar and of being "in it [just] for the money" for no reason other than his relationship with AMFA. In addition, he testified that meetings at which he spoke were frequently interrupted by catcalls from IAM representatives. He also testified that various written materials produced by IAM had depicted him as a liar who was controlling AMFA for his own financial gain.
 
 
 40
 Plaintiffs elicited this testimony to demonstrate that IAM was hostile to those associated with AMFA. This, in turn, supported their claim that IAM's adverse decision concerning plaintiffs' seniority was a result of plaintiffs' association with AMFA before IAM took control of their unit, rather than a neutral policy related to plaintiffs having resigned from Eastern before moving to Trump.
 
 
 41
 Prior to Seham's being called to the stand, IAM objected to his testimony on the ground that "lawyers representing litigants should not be called as witnesses in trials involving those litigants if such testimony can be avoided consonant with the end of obtaining justice." United States v. Alu, 246 F.2d 29, 33 (2d Cir.1957). Judge Korman rejected this application of the so-called "advocate-witness rule" because Seham never represented plaintiffs in the case at bar — or any case, for that matter. Further, Seham would testify merely to facts of which he had personal knowledge, namely the hostility he encountered from IAM officials simply as a result of his association with AMFA. IAM has renewed its argument against Seham's testimony on appeal.[6]
 
 
 42
 Judge Korman properly recognized that there is no hard-and-fast rule against testimony by attorneys who have represented clients in the past. The advocate-witness rule applies, first and foremost, where the attorney representing the client before a jury seeks to serve as a fact witness in that very proceeding. The concerns implicating the rule are that (1) the lawyer will appear to vouch for his own credibility, (2) the lawyer's testimony will put opposing counsel in a difficult position when he has to vigorously cross-examine his lawyer-adversary and seek to impeach his credibility, and (3) there may be an implication that the testifying attorney may be distorting the truth as a result of bias in favor of his client. See Culebras Enterprises Corp. v. Rivera-Rios, 846 F.2d 94, 99-100 (1st Cir.1988). Most important, when one individual assumes the role of both advocate and witness it "[may] so blur[ ] the line between argument and evidence that the jury's ability to find facts is undermined." United States v. Arrington, 867 F.2d 122, 126 (2d Cir.1989).
 
 
 43
 For the most part, these "concerns are absent or, at least, greatly reduced, when [as here] the lawyer-witness does not act as trial counsel." Culebras Enterprises Corp., 846 F.2d at 100. The only concern that may remain is the implication that Seham may have been biased in his testimony as a result of his former representation of plaintiffs. If the fear of bias were sufficient on its own to prevent Seham from testifying, then a similar argument could be made that an accountant, doctor, or anyone else who ever had a relationship with a party should be forbidden to testify out of a concern for potential bias. That, of course, is not the rule. Rather, we permit the opposing party to cross-examine the witness and raise to the jury any challenges to the credibility of the witness. See 27 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6012, at 179, 180 (1990) (noting that potential bias alone does not justify the advocate-witness rule). Indeed, IAM's counsel elicited from Seham his prior relationship with plaintiffs, apparently in an attempt to impeach his credibility.
 
 
 44
 Given that the professional relationship between Seham and the plaintiffs was of short duration, and ended long before the case came to trial, we do not see how this relationship alone would disqualify Seham from testifying, particularly since his testimony — that IAM was hostile to those who associated with AMFA — went to the heart of the case.
 
 
 45
 This conclusion is supported by the way in which we have addressed the advocate-witness issue in previous cases. We have suggested that where an attorney must take the stand to represent a client, a trial judge could, in his or her discretion, avoid any problems simply by requiring the party to retain new counsel. See United States v. Kwang Fu Peng, 766 F.2d 82, 86-87 (2d Cir.1985); United States v. Cunningham, 672 F.2d 1064, 1074 (2d Cir.1982). In other words, the remedy where an attorney is called to testify may be to disqualify the attorney in his representational capacity, not necessarily his testimonial capacity. See 27 Wright & Gold, supra, § 6012, at 176, 183. Here, of course, there was no need to disqualify Seham from representing plaintiffs because, at the time of the trial, he no longer represented them. For these reasons, Judge Korman did not abuse his discretion in permitting Seham to testify.
 
 IV. Sufficiency of the Evidence
 
 46
 IAM next argues that the evidence submitted at trial was insufficient to support the jury's conclusion that IAM was motivated by hostility when it decided not to apply plaintiffs' Eastern seniority. "A party seeking to overturn a verdict based on the sufficiency of the evidence bears a very heavy burden." Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir.1998).
 
 
 47
 We will upset a jury verdict only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture. We must view the evidence in the light most favorable to the party in whose favor the verdict was rendered, giving that party the benefit of all reasonable inferences that the jury might have drawn in his favor.
 
 
 48
 Id. (internal citations and quotation marks omitted).
 
 
 49
 In this case, there was ample evidence, when viewed in the aggregate, to support the verdict. IAM claimed at trial that its motivation for stripping plaintiffs of their Eastern seniority was their having resigned from Eastern. This claim was belied by the position it had taken during the Eastern bankruptcy proceeding that plaintiffs were to be considered as merely having transitioned from Eastern to Trump. Once plaintiffs showed that IAM's purported neutral motivation was pretextual, they only needed to convince the jury that the single other motivation suggested by either party — animus as a result of plaintiffs' association with AMFA — was the reason for IAM's adverse decision.
 
 
 50
 Plaintiffs met this burden by producing various pieces of evidence pointing to this rationale. For instance, at least one plaintiff testified to personal knowledge of the acrimony between IAM and AMFA. Further, at least one IAM official testified as to the hostility between the groups. In addition, with respect to plaintiffs themselves, the minutes of an IAM local lodge stated that plaintiffs "voted for AMFA. IAM will now go for their jobs." Similarly, various IAM union members petitioned IAM officials not to accord plaintiffs their Eastern seniority because they voted in favor of AMFA. Viewing this evidence in the aggregate and in light of Seham's corroborating testimony that IAM officials were themselves hostile towards those associated with AMFA, the jury reasonably could have believed that IAM was swayed by the sentiments expressed by its members and officials.
 
 
 51
 V. Application of the Verdict to All Plaintiffs
 
 
 52
 Finally, IAM contends that only those plaintiffs who testified at trial as to their losses should be permitted to benefit from the jury's verdict and that IAM is entitled to judgment against all other plaintiffs. Frankly, we do not understand the basis for this challenge. We never have held that every plaintiff must testify as to his or her personal losses in order to establish liability for the implementation of a policy that was applied equally to all plaintiffs. We decline to do so today.
 
 CONCLUSION
 
 53
 For these reasons, we affirm.
 
 
 
 Notes:
 
 
 [1]
 Plaintiffs also included various other defendants and legal claims in their complaint, but these were dismissed early in the proceedings and do not concern us in this appealSee Ramey v. District 141, 2002 WL 32152292 at *5-*6, 2002 U.S. Dist. LEXIS 26670, at *16-*17 (E.D.N.Y. Nov. 4, 2002).
 
 
 [2]
 IAM, of course, has never conceded that it was motivated by animus. However, we are bound by the jury's unequivocal determination that IAM would have accorded plaintiffs their Eastern seniority but for their association with AMFA
 
 
 [3]
 It is true that plaintiffs were in an adversarial position on the issue of seniority even before they brought their suit. However, invoking the judicial process and hauling an organization into federal court as a defendant clearly magnifies and heightens the adversarial nature of the relationship. Parties are understandably loathe to institute actions against those with whom they maintain ongoing relationships until it is absolutely necessary to do so
 
 
 [4]
 In some limited circumstances, a suit for a preliminary injunction may be brought based on such an announcement. However, because the standards for obtaining preliminary injunctive relief are significantly higher than the standards for litigating a case after a breach has occurred, the possibility of maintaining a preliminary injunction proceeding does not trigger the statute of limitations
 
 
 [5]
 Because we hold that IAM has not met its burden to demonstrate that plaintiffs reasonably should have known that the breach occurred before January 28, 1999, we do not address the difficult and unsettled question of how certain it must be that harm will be caused by a union's breach in order to trigger the statute of limitations. We have held that the statute of limitations is triggered even if it is not absolutely certain that a union member will be harmed by a breachSee, e.g., Santos, 619 F.2d at 969 (a cause of action may accrue even if plaintiffs' position may be vindicated through non-judicial means). However, we note that there must be some likelihood that a harm will result from a union's breach before a member may file suit. Otherwise, such claims would be unduly speculative. Fell, 360 F.3d at 139 (federal courts may not "entangl[e themselves] in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur"). We caution district courts to consider this issue in the future when faced with a suit brought after a union breaches but before tangible harm is caused.
 
 
 [6]
 IAM also appears to argue that Seham's testimony was "irrelevant" to the issues at trial because it related solely to his experiences as an advocate for AMFA and not to any hostility directed toward plaintiffs by IAM officials. This argument is plainly without merit. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. If IAM officials directed hostility and animus toward Seham simply as a result ofhis association with AMFA, that tends to support plaintiffs' claim that IAM was hostile towards them as a result of their association with AMFA.