Lindsay v. Ass'n of Prof'l Flight Attendants

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: July 6, 2009                    Decided: September 21, 2009)

Docket Nos. 08-4122-cv (L), 08-4128-cv (con), 08-4130-cv (con)

_____

JILL LINDSAY, individually and on behalf of all others similarly situated, CAROL JOHNSON,
CONSTANCE LAMATTINA, DANIEL SANTIAGO, DEBORAH WHITTINGTON, DOTTIE LONG,
JANET GOLD, JUDITH ALEXANDER, KAREN RIVOIRA, LAURENCE E. SALOMON III, PATRICIA
KENNEDY, PATTY GENTRY, REBECCA SMITH,

*Plaintiffs-Appellants,*

— v.—

ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS, a business entity of unknown type,
AMR CORPORATION, a Delaware corporation, also known as American Airlines,
AMERICAN AIRLINES, INC., also known as American Eagle, and JOHN WARD,

*Defendants-Appellees.*

_____

B e f o r e :

RAGGI, HALL, *Circuit Judges*, and BIANCO, *District Judge*.[*]

_____

_____

   [*] Judge Joseph F. Bianco, of the United States District Court for the Eastern District
of New York, sitting by designation.

Plaintiffs, suing individually and on behalf of a putative class of flight attendants, challenge the validity of a Restructuring Participation Agreement reached between their former employer American Airlines and its parent AMR Corporation (collectively, the "corporate defendants"), and their union the Association of Professional Flight Attendants and its former president John Ward (collectively, the "union defendants"). Plaintiffs now appeal an award of summary judgment entered in the Eastern District of New York (Nina Gershon, *Judge*) in favor the corporate defendants on plaintiffs' Railway Labor Act ("RLA") and state law claims, and in favor of the union defendants on plaintiffs' breach of the duty of fair representation claim. Plaintiffs' appeal fails because (1) the relevant RLA provisions, 45 U.S.C. § 152, First and Seventh, do not provide a private cause of action; (2) the RLA preempts their state law claims; and (3) plaintiffs failed to adduce sufficient evidence of a material factual dispute on their fair representation claim to defeat summary judgment.

AFFIRMED.

---

EMILY M. BASS, Brooklyn, New York (Steven M. Nachman, New York, New York; Michael S. Haber, New York, New York; Martin Garbus, Davis & Gilbert, New York, New York, *on the brief*), *for Plaintiffs-Appellants*.

STEPHEN B. MOLDOF (Michael L. Winston, Travis M. Mastroddi, *on the brief*), Cohen, Weiss and Simon LLP, New York, New York, *for Defendants-Appellees Association of Professional Flight Attendants and John Ward*.

THOMAS E. REINERT, JR. (Jonathan C. Fritts, *on the brief*), Morgan, Lewis & Bockius LLP, Washington, D.C., *for Defendants-Appellees American Airlines, Inc. and AMR Corporation*.

---

REENA RAGGI, *Circuit Judge*:

Plaintiffs Jill Lindsay, Carol Johnson, Constance LaMattina, Daniel Santiago, Deborah Whittington, Dottie Long, Janet Gold, Judith Alexander, Karen Rivoira, Laurence E. Salomon III, Patricia Kennedy, Patty Gentry, and Rebecca Smith, proceeding individually, and in Ms. Lindsay's case, also on behalf of a putative class of flight attendants, filed suit in the United States District Court for the Eastern District of New York (Nina Gershon, *Judge*), challenging the validity of a Restructuring Participation Agreement reached between their former employer, defendants American Airlines and its parent AMR Corporation (collectively, "American Airlines"), and their union, defendant Association of Professional Flight Attendants, and its former president defendant John Ward (collectively, "APFA" or the "union"). Plaintiffs now appeal an award of summary judgment entered on July 22, 2008, in favor of American Airlines on plaintiffs' claims under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq.; in favor of American Airlines and APFA on plaintiffs' state law claims; and in favor of APFA on plaintiffs' claim of a breach of the duty of fair representation. We conclude that plaintiffs' challenge fails because (1) the statutory sections relied on by plaintiffs to support their RLA claim, 45 U.S.C. § 152, First and Seventh, do not provide for a private cause of action; (2) the RLA preempts plaintiffs' state law claims; and

3

(3) plaintiffs failed to adduce sufficient evidence of a material fact on their fair representation claim to defeat summary judgment.

Accordingly, we affirm the judgment of the district court in favor of defendants.

## I.   **Background**

The district court's thorough opinion fairly chronicles the complex events giving rise to defendants' Restructuring Participation Agreement, which plaintiffs challenge in this action.  See Marcoux v. Am. Airlines, Inc., --- F. Supp. 2d ---, 2006 WL 842888 (E.D.N.Y. 2006).  We assume familiarity with that opinion, and we do not ourselves repeat the facts except as necessary to discuss plaintiffs' appeal of the award of summary judgment.

## II.   **Discussion**

### A.   Standard of Review

We review an award of summary judgment de novo, "construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor."  SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).  Summary judgment may be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the

4

governing law." SCR Joint Venture L.P. v. Warshawsky, 559 F.3d at 137.

        B.     Plaintiffs' Railway Labor Act Claims

Plaintiffs contend that American Airlines violated those provisions of the RLA codified at 45 U.S.C. § 152, First and Seventh by supplanting an existing collective bargaining agreement with the Restructuring Participation Agreement. Section 152, First states as follows:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152, First.

Section 152, Seventh states as follows:

> No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

Id. § 152, Seventh.

No party has pointed us to any case law addressing whether these sections provide for a private right of action by individual employees, nor have we identified any. In considering this question of first impression, we begin by reviewing the general enforcement structure of the RLA.

5

### 1. Arbitral Resolution of Major and Minor Disputes Under the RLA

"The Railway Labor Act was passed in 1926 to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce." Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union, 396 U.S. 142, 148 (1969); see also 45 U.S.C. § 181 (amending RLA to apply to interstate air carriers). Toward this end, the RLA provides an arbitral mechanism for "the prompt and orderly settlement" of two classes of disputes between unions and employers. Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994) (quoting 45 U.S.C. § 151a). The first class, referred to as "major" disputes, relates to "the formation of collective [bargaining] agreements or efforts to secure them." Consolidated Rail Corp. v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 302 (1989) (internal quotation marks omitted). The second class, known as "minor" disputes, see id. at 303, "grow[s] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions," 45 U.S.C. § 151a(5). In other words, "major disputes seek to create contractual rights, minor disputes to enforce them." Hawaiian Airlines, Inc. v. Norris, 512 U.S. at 253.

### 2. Private Enforcement of the RLA

Beyond the arbitral scheme for resolving disputes between employers and unions, the RLA also provides for federal criminal enforcement. See 45 U.S.C. § 152, Tenth ("It shall be the duty of any United States attorney to whom any duly designated representative of a

carrier's employees may apply to institute in the proper court and to prosecute under the direction of the Attorney General of the United States, all necessary proceedings for the enforcement of the provisions of this section."). Although the RLA does not explicitly provide a private civil cause of action, the Supreme Court has found such an action by a union implicit in the statutory scheme.

In Texas & New Orleans Railroad Co. v. Brotherhood of Railway & Steamship Clerks, the Supreme Court recognized a private right of action by a union alleging that the defendant company was "interfering with, influencing, or coercing the clerical employees of the railroad company in the matter of their organization and designation of representatives" in violation of § 152, Third. 281 U.S. 548, 555 (1930). The Court concluded that "Congress, in the legislation of 1926, while elaborating a plan for amicable adjustments and voluntary arbitration of disputes between common carriers and their employees, thought it necessary to impose, and did impose, certain definite obligations enforceable by judicial proceedings." Id. at 567. In fact, private civil proceedings constitute the bulk of cases arising under the RLA. See United States v. Winston, 558 F.2d 105, 108 & n.3 (2d Cir. 1977) (noting "[t]he paucity of criminal proceedings under § 152, when contrasted with the active pursuit of civil relief thereunder").

Although much of the case law involving private causes of action under § 152 concerns claims brought by or against a certified union, our sister circuits have recognized an implied private right of action for individual employees against their employer under

7

certain RLA provisions, notably § 152, Third and Fourth.  See, e.g., Bensel v. Allied Pilots

Ass'n, 387 F.3d 298, 318 (3d Cir. 2004) (collecting cases); Fennessy v. Sw. Airlines, 91 F.3d

1359, 1362-64 (9th Cir. 1996); Stepanischen v. Merchs. Despatch Transp. Corp., 722 F.2d

922, 927 (1st Cir. 1983).  The Third Circuit explained that "[i]mplying a private cause of

action for individual employees under 45 U.S.C. § 152, Third & Fourth is appropriate given

that those sections prohibit carriers from discriminating against employees in connection with

union organizing activities."[1]  Bensel v. Allied Pilots Ass'n, 387 F.3d at 318 (emphasis in

original).  By contrast, the Third Circuit declined to find an implied private cause of action

for individual employees in § 152, Second and Ninth because, although the statute "may

indicate a congressional intent to create a private cause of action for a duly certified

representative that is injured pursuant to these provisions," that "does not imply that

Congress intended to create a private right of action for any group or groups of individual

employees claiming to act on behalf of the relevant employees."[2]  Id. at 319.

---

[1] Section 152, Fourth instructs that an employer may not "deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees."  45 U.S.C. § 152, Fourth.  Section 152, Third instructs that neither labor nor management may "interfere with, influence, or coerce the other [party] in its choice of representative."  45 U.S.C. § 152, Third.

[2] Section 152, Second instructs that all disputes between a carrier and its employees "shall be considered, and, if possible, decided . . . in a conference between [designated] representatives."  45 U.S.C. § 152, Second.  Section 152, Ninth instructs the Mediation Board to resolve disputes "as to who are the [designated] representatives."  45 U.S.C. § 152, Ninth.

3. <u>Section 152, First and Seventh Do Not Provide a Private Cause of Action</u>

Against this background, we consider whether § 152, First or Seventh provides an individual employee with a private right of action against his employer. Because our task is to ascertain Congress's intent, we look first to the text and structure of the statute. <u>See Alexander v. Sandoval</u>, 532 U.S. 275, 286-87 (2001). If Congress has manifested no intent to provide a private right of action, we cannot create one. <u>See id.</u> We identify nothing in the RLA's text or structure suggesting Congress's intent to create a private remedy. We next proceed to consider "whether a private remedy is implicit in [the] statute." <u>Cort v. Ash</u>, 422 U.S. 66, 78 (1975). In undertaking this second inquiry, four factors guide our analysis:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted – that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

<u>Id.</u> (internal citations and quotation marks omitted).[3] For the reasons stated in the next three

---

[3] We have expressed some doubt about whether, in light of more recent cases, we may still imply a private right of action based on the <u>Cort v. Ash</u> factors. <u>See</u> <u>Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.</u>, 286 F.3d 613, 619 (2d Cir. 2002) (noting that, after <u>Cort v. Ash</u>, the Supreme Court "focused the analysis on the single question of whether congressional intent to create a private cause of action can be found in the relevant statute"); <u>Olmsted v. Pruco Life Ins. Co. of N.J.</u>, 283 F.3d 429, 434 (2d Cir. 2002) (noting that recent Supreme Court decisions have "subordinat[ed the <u>Cort v. Ash</u> factors] to statutory text"). <u>Sandoval</u>, however, does not purport to overrule <u>Cort v. Ash</u>. Accordingly, we apply these

9

subsections of this opinion, we conclude that Congress did not intend to create a private cause of action for employees to enforce § 152, First or Seventh. The appropriate remedy for injuries of the sort plaintiffs allege is a claim against their union for breach of the duty of fair representation.[4]

　　　　　　　　　　　　a.　　Text and Structure

The text of § 152, First and Seventh reveals no congressional intent to create a private right of action. "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." Alexander v. Sandoval, 532 U.S. at 289 (internal quotation marks omitted); see also Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 116 (2d Cir. 2007) ("[T]he absence of 'rights-creating language' indicates a lack of congressional intent to create private rights of action."). Section 152, First imposes a "duty" on "all carriers, their officers, agents, and employees." Likewise, § 152, Seventh bars certain actions by a "carrier, its officers, or agents." Because both provisions focus on the regulated parties, we discern no intent to confer privately enforceable rights.

The statute's structure also supports this conclusion. As the Supreme Court has recognized, "[t]he express provision of one method of enforcing a substantive rule suggests

---

factors to illuminate our analysis of congressional intent.

[4] We discuss plaintiffs' claim against APFA for breach of the duty of fair representation infra at **[25-31]**.

10

that Congress intended to preclude others." Alexander v. Sandoval, 532 U.S. at 290. Here, Congress expressly contemplated that the RLA would be enforced through arbitral panels, see 45 U.S.C. § 184, and criminal prosecution, see 45 U.S.C. § 152, Tenth.[5] Congress's failure to provide similarly for private enforcement signals caution in inferring any such right of action. The prior implication of private rights under other subsections of 45 U.S.C. § 152 warrants no different conclusion. Indeed, Sandoval involved Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. In an earlier Title VI case, the Court had noted that private plaintiffs could sue under § 601. See Cannon v. Univ. of Chicago, 441 U.S. 677, 694-96 (1979). Nevertheless, that consideration was not relevant to Sandoval's textual and structural analysis of whether § 602 created a similar private remedy. We therefore conclude that the RLA's text and structure does not manifest Congress's intent to create a private enforcement mechanism for all provisions of the statute.

b. Section 152, First

Our analysis of the four Cort v. Ash factors bolsters this conclusion. The statutory requirement in § 152, First that carriers strive to "maintain agreements concerning rates, rules, and working conditions," may well benefit individual employees, the first relevant factor under Cort v. Ash, 422 U.S. at 78. This is not sufficient, however, to imply a private right of action because the statutory scheme achieves its purpose by collectivizing

_____

[5] The RLA provides for criminal enforcement of § 152, Third, Fourth, Fifth, Seventh, and Eighth – not § 152, First. See 45 U.S.C. § 152, Tenth.

11

employees' individual interests. See NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 180 (1967) (noting that "majority-rule concept is today unquestionably at the center of our federal labor policy" (internal quotation marks omitted)). Thus, § 152, First is distinguishable from § 152, Third and Fourth, for which private rights of action have been recognized, in that the latter provisions are specifically aimed at preventing employer interference with individual employees' ability to join a collective bargaining scheme. With that interest protected, however, Congress clearly intended that individual preferences give way to the collective position embodied by the certified union representative. It is agreements reached by such representatives with employers that are the focus of § 152, First. See Virginian Ry. Co. v. Sys. Fed'n No. 40, 300 U.S. 515, 548 (1937) (observing that § 152, First is concerned with negotiations between an employer and the "authorized representative of its employees").

Indeed, the second Cort v. Ash factor signals that Congress did not intend to provide a private cause of action for individual employees in § 152, First. See 422 U.S. at 78. Section 152, Second states that "[a]ll disputes between a carrier . . . and its . . . employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier . . . and by the employees thereof interested in the dispute." 45 U.S.C. § 152, Second (emphasis added). Section 152, Fourth explains that the very "right to organize and bargain collectively" is accomplished "through representatives of [the employees'] own choosing." 45 U.S.C. § 152, Fourth (emphasis added). That provision further states that "[t]he majority

12

of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter." Id. Taken together, these provisions leave no doubt that, where, as here, a "craft or class of employees" has selected a representative union, Congress intended the power to "make" and the duty to "maintain agreements concerning rates of pay, rules, and working conditions," id. § 152, First, to run between the representative union and the company. Indeed, the Supreme Court has explained that "members [of a craft or class] cannot bargain individually on behalf of themselves as to matters which are properly the subject of collective bargaining." Steele v. Louisville & N.R. Co., 323 U.S. 192, 200 (1944); see also Virginian Ry. Co. v. Sys. Fed'n No. 40, 300 U.S. at 548.

Relatedly, we conclude under the third Cort v. Ash factor that it would not be consistent "with the underlying purposes of the legislative scheme" to imply a private cause of action for employees under § 152, First. By its terms, § 152, First links its requirement to make and maintain agreements to the larger RLA purpose "to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152, First; see also id. § 151a(1). As described above, the statute seeks to achieve this goal by vesting collective bargaining authority in representative unions. The Supreme Court has explained that, in enacting the RLA, "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it

13

represents, but it has also imposed on the representative a corresponding duty." Steele v. Louisville & N.R. Co., 323 U.S. at 202. As such, the RLA is consistent with a

> [n]ational labor policy . . . built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees.

NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. at 180. The union's ability to exercise this vested authority is protected by the RLA. At the same time, it is the union's "corresponding duty" to those it represents that ensures the fair exercise of this authority. Steele v. Louisville & N.R. Co., 323 U.S. at 202. It could not be otherwise in a statutory regime that prioritizes continuity and "majority-rule" over the "complete satisfaction of all who are represented." NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. at 180.

The facts of this case demonstrate why individual employee actions under § 152, First would be inconsistent with a statutory scheme embodying these principles. The Restructuring Participation Agreement, which plaintiffs complain fails to maintain a 2001 collective bargaining agreement ("CBA"), was agreed to by APFA on April 8, 2003, and approved by APFA's members on April 16, 2003. In that document, "the parties agree that the 2001 CBA shall remain in full force and effect except as modified herein." Among the modifications here at issue was the date for possible amendment of the CBA, with the union and its membership agreeing to an extension from November 30, 2004, to April 30, 2009.

14

Following the disclosure of the Special Executive Retirement Plan on April 17, 2003, the union extracted a concession from American Airlines on the point, making the 2001 CBA amendable one year earlier, on April 30, 2008.

However dissatisfied individual employees may be with these modifications to the 2001 CBA, allowing them to sue American Airlines under § 152, First to set aside a Restructuring Participation Agreement agreed to by their union representative and ratified by the union membership would risk the very disruption in commerce that the RLA seeks to avoid. Indeed, under the agreed-to modifications, American Airlines cannot simply revert to the original terms of the 2001 CBA. Plaintiffs' dispute is thus not with American Airlines, which could not take the action plaintiffs seek without violating the modified CBA, but rather with the union, which negotiated for the modified CBA terms that now bind American Airlines and that form the basis of plaintiffs' claim. A claim of this nature is appropriately brought against the union for breach of the duty of fair representation. See NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. at 181 ("It was because the national labor policy vested unions with power to order the relations of employees with their employer that this Court found it necessary to fashion the duty of fair representation."); see also infra **[25-31]** (discussing plaintiffs' duty of fair representation claim).

c.      Section 152, Seventh

The statutory provision prohibiting carriers from changing "rates of pay, rules, or working conditions" except as prescribed by agreement or statute, 45 U.S.C. § 152, Seventh, may also benefit employees, but here too we do not recognize an implied private right of action by individual employees against an employer.

As the Supreme Court has observed, the purpose of § 152, Seventh is twofold: "it operates to give legal and binding effect to collective agreements, and it lays down the requirement that collective agreements can be changed only by the statutory procedures." Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union, 396 U.S. at 156. Thus, § 152, Seventh is a "status quo" provision, requiring "that parties to a CBA governed by the RLA maintain objective working conditions during the pendency of any dispute arising under (or during the re-negotiation of) their CBA." In re Nw. Airlines Corp., 483 F.3d 160, 167 (2d Cir. 2007). More specifically, in the event of a "major dispute," § 152, Seventh preserves the status quo while the employer and the union engage in the negotiation required by 45 U.S.C. §§ 155 and 156. See Consolidated Rail Corp. v. Ry. Labor Executives Ass'n, 491 U.S. at 302-03.

Precisely because the statutory scheme as interpreted by the courts recognizes the representative union as the proper party to invoke § 152, Seventh, we conclude that the second and third Cort v. Ash factors weigh heavily against recognition of a private right of action by individual employees. See 422 U.S. at 78. The provision is only implicated where

16

a "craft or class" of employees has already selected a representative to bargain collectively on its behalf, 45 U.S.C. § 152, Fourth, and where an employer attempts to make changes that affect the employees "as a class," § 152, Seventh. Under those circumstances, an individual employee's "power to order his own relations with his employer" is "extinguishe[d]" in favor of "a power vested in the chosen representative to act in the interests of all employees." NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. at 180.

Because we conclude that neither § 152, First nor § 152, Seventh provides a private cause of action to individual employees against their employers under the circumstances presented here, we affirm the district court's dismissal of these claims and its entry of judgment in favor of defendants.

C.     Plaintiffs' State Law Claims

Plaintiffs assert that the district court erred in concluding that their state law claims against American Airlines were preempted by the RLA. See Marcoux v. Am. Airlines, Inc., --- F. Supp. 2d ---, 2006 WL 842888, at *7. In their reply brief, plaintiffs clarify that they appeal only the dismissal of (1) Claim Eleven, in which they charge APFA with breach of its contractual relationship with plaintiffs as set forth in the union's constitution and bylaws; (2) Claim Twelve, in which they charge American Airlines with intentional interference with the contractual relationship between APFA and its members; and (3) Claim Sixteen, in which plaintiffs charge American Airlines with intentionally causing APFA to breach certain provisions of its constitution and bylaws relating to balloting and electioneering practices.

17

Accordingly, we limit our discussion to those claims. See Maloney v. Cuomo, 554 F.3d 56, 58 n.2 (2d Cir. 2009) (noting that claims not pursued on appeal are deemed waived). Like the district court, we conclude that these claims are preempted by the RLA, and we therefore affirm their dismissal.

### 1. Preemption in Labor Cases Generally

The Supreme Court established the basic tenets of federal preemption in the labor context in San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959). In Garmon, the Court considered whether California could provide damages under state law to an employer based on employee picketing, which the California Supreme Court determined was an unfair trade practice. See id. at 238-39. The employer had begun a simultaneous proceeding before the National Labor Relations Board ("NLRB"), over which the Regional Director had declined to exercise jurisdiction "presumably because the amount of interstate commerce involved did not meet the Board's monetary standards in taking jurisdiction." Id. at 238.

The Court identified the issue as "[t]he extent to which the variegated laws of the several States are displaced by a single, uniform, national rule," namely, the National Labor Relations Act. Id. at 241. The Court concluded as follows:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation

18

> involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.

Id. at 244. Stated differently, "[t]he governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy." Id. at 246. This principle, the Court explained, applies regardless of whether the state law at issue was "tort law of general application [or] specialized labor relations statutes." Id. at 244 n.3. Finally, the Court explained that, even if application of state law in a particular situation would not, in fact, conflict with "the active assertion of federal authority," it would nevertheless "involve[] a conflict with federal policy in that it involves allowing two law-making sources to govern." Id. at 247.

The Garmon rule is subject to two exceptions. First, states retain power to regulate activity that is "a merely peripheral concern of the Labor Management Relations Act." Id. at 243. Second, federal labor law does not preempt state law where "the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [the Court] could not infer that Congress had deprived the States of the power to act." Id. at 244. As an example of the second exception, the Court pointed to states' continued ability to regulate "violence and imminent threats to the public order." Id. at 247.

19

## 2. Preemption in RLA Cases

Although Garmon was decided in the context of the National Labor Relations Act, similar reasoning animated the Supreme Court's application of preemption to the Railway Labor Act in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369 (1969); see, e.g., Bensel v. Allied Pilots Ass'n, 387 F.3d at 321 (suggesting that Garmon was "extended" to the RLA in Jacksonville Terminal). In Jacksonville Terminal, the Court considered whether, in the context of a "major" labor dispute governed by the RLA, a Florida court had the authority to enjoin the picketing of a freight rail terminal facility under state tort and labor laws. 394 U.S. at 372-77. The Court concluded that it did not because "the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the [RLA's] processes." Id. at 380. The Court reached this conclusion even while acknowledging that, unlike the situation presented in Garmon, in a major dispute under the RLA there is "no administrative agency equivalent to the NLRB with jurisdiction over railway labor disputes." Id. at 384 n.19.

In the years since Jacksonville Terminal and Garmon were decided, this and other circuits have applied their reasoning to major RLA disputes, see, e.g., Bensel v. Allied Pilots Ass'n, 387 F.3d at 320-23 (applying Garmon and Jacksonville Terminal to RLA major dispute and affirming dismissal of, inter alia, tortious and malicious interference, fraudulent misrepresentation, and breach of contract claims); to minor RLA disputes, see, e.g., Beers v. S. Pac. Transp. Co., 703 F.2d 425, 428-29 (9th Cir. 1983) (holding that intentional

20

infliction of emotional distress claim brought in context of "minor" RLA dispute was preempted under <u>Garmon</u>); and to RLA issues, like those presented here, not falling squarely within either category, <u>see, e.g.</u>, <u>Kaufman v. Allied Pilots Ass'n</u>, 274 F.3d 197, 202-03 (5th Cir. 2001) (applying <u>Garmon</u> to hold third-party tortious interference claim preempted by RLA); <u>Air Transp. Ass'n of Am. v. City & County of San Francisco</u>, 266 F.3d 1064, 1076 (9th Cir. 2001) (noting that "[s]tate laws that frustrate the purpose of the RLA are preempted"); <u>Peterson v. Air Line Pilots Ass'n, Int'l</u>, 759 F.2d 1161, 1170-71 (4th Cir. 1985) (holding that RLA preempts state law claim for wrongful discharge even where RLA arbitral mechanism not implicated because "state claims seek to vindicate rights largely secured by federal law"); <u>cf.</u> <u>Delta Air Lines v. Kramarsky</u>, 650 F.2d 1287, 1301-02 (2d Cir. 1981) (applying <u>Garmon</u> analysis to claim that New York Disability Benefits Law ("DBL") was preempted by RLA, and holding that because DBL "governs matters outside the intended reach of the RLA . . . the RLA therefore does not preempt the DBL"), <u>vacated in part on different grounds on rehearing by</u> 666 F.2d 21, 26 (2d Cir. 1981), <u>affirmed in part and vacated in part on other grounds by</u> <u>Shaw v. Delta Air Lines, Inc.</u>, 463 U.S. 85, 92 n.8 (1983) (noting that Second Circuit resolved RLA preemption claim against Delta, but that claim was not before Supreme Court).

Contrary to plaintiffs' assertion, these cases demonstrate that the principles animating <u>Garmon</u>, <u>Jacksonville Terminal</u>, and their progeny are applicable to plaintiffs' state law claims. Underlying these principles is a concern with whether the particular state law at issue

21

may "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67 (1941). Accordingly, courts have invoked Garmon to preempt certain state law causes of action even where the RLA claim at issue is not subject to the exclusive primary jurisdiction of the National Railroad Adjustment Board ("NRAB"). See 45 U.S.C. § 153; Pennsylvania R.R. Co. v. Day, 360 U.S. 548, 552 (1959) (discussing exclusive primary jurisdiction of NRAB over minor RLA disputes). Similarly, courts have applied Jacksonville Terminal to preempt more than just those state law claims that attempt "to regulate economic warfare between disputants subject to the [RLA's] processes." See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. at 380. Although expansive views of the preemption doctrine have not escaped criticism, see Wyeth v. Levine, 129 S. Ct. 1187, 1211 (2009) (Thomas, J., concurring), we need not here reach the outer boundaries of the doctrine to conclude that the maintenance of plaintiffs' state tort claims "would frustrate effective implementation of the [RLA's] processes." Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. at 380.

### 3. Claims Eleven, Twelve, and Sixteen Are Preempted by the RLA

Claims Twelve and Sixteen allege that actions of American Airlines in negotiating the Restructuring Participation Agreement caused APFA to breach its contractual duties to its members, see Compl. ¶¶ 304-07, 325-35, while Claim Eleven alleges that APFA breached its contract with its members in the course of negotiating and ratifying the Restructuring

22

Participation Agreement, see id. ¶¶ 299-303. These claims are akin to those discussed by the Third Circuit in Bensel v. Allied Pilots' Association:

> [A]ll involve alleged interference with [plaintiffs'] employment rights as established by the various agreements that govern their wages and other benefits as well as their right to be fairly represented under [§ 152]. Thus the . . . rights at issue are founded upon federal law, derive their strength and protection from federal law, and exist to effectuate a nationwide federal labor policy.

387 F.3d at 321. Such claims must rise or fall based on their merit under the RLA.[6]

Parties whose conduct is governed by the RLA approach collective bargaining negotiations mindful of the incentives and penalties set forth in the Act. As in Jacksonville Terminal, the imposition of additional state regulation on core RLA conduct would alter the balance struck by Congress in this regard. See 394 U.S. at 381. "[T]he potentials for conflict, and for the imposition of inconsistent state obligations, are simply too great" to allow each state to regulate conduct central to Congress's RLA goals. Id. (internal citations

_____

[6] We note, with respect to plaintiffs' breach claim against APFA, that plaintiffs have alleged no independent duty owed them individually under the contract. See United Steelworkers of Am. v. Rawson, 495 U.S. 362, 374 (1990) ("If an employee claims that a union owes him a more far-reaching duty [than the duty of fair representation], he must be able to point to language in the collective-bargaining agreement specifically indicating an intent to create obligations enforceable against the union by the individual employees."); see also May v. Shuttle, Inc., 129 F.3d 165, 179 (D.C. Cir. 1997) (holding RLA duty of fair representation claim preempts "identical" state law claims of fraud and deceit); Nellis v. Air Line Pilots Ass'n, 15 F.3d 50, 51 (4th Cir. 1994) (same); Peterson v. Air Line Pilots Ass'n, Int'l, 759 F.2d 1161, 1170 (4th Cir. 1985) (noting that state law tort claims were "essentially identical" to duty of fair representation claim and therefore dismissing state claims as preempted by RLA).

omitted).  This task "'cannot be left to the laws of the many States, for it would be fatal to the goals of the Act' if conduct were prohibited by state laws 'even though in furtherance of the federal scheme. The needs of the subject matter manifestly call for uniformity.'" Id. (quoting International Ass'n of Machinists AFL-CIO v. Cent. Airlines, Inc., 372 U.S. 682, 691-92 (1963)).  We easily conclude that the imposition of additional state liability on the defendants for conduct during collective bargaining negotiations would upset the "balance of power" established by the RLA, Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 619 (1986), and "frustrate effective implementation of the [Act's] processes," Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. at 380.

Plaintiffs submit that there is, in fact, "no conflict" between their state common law claims and the RLA.  Appellants' Br. at 37.  The point requires little discussion.  In Garmon, the Supreme Court observed that, even if application of state law "in a particular situation will not, in fact, conflict with the active assertion of federal authority," the state claim is nevertheless preempted because "two law-making sources" may not govern labor policy.  San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. at 247.  Similarly, in Jacksonville Terminal, the Court held the state regulation preempted not because it actually conflicted with the RLA, but because of the "potentials for conflict" that would arise if each state were entitled to set its own standard.  394 U.S. at 381.  In sum, actual conflict is not a prerequisite to finding a state claim preempted by the RLA.

24

Plaintiffs have failed to offer any compelling argument as to why their state law claims are not governed by the well-settled line of precedents deriving from <u>Garmon</u> and <u>Jacksonville Terminal</u>.[7]  Nor have plaintiffs attempted to demonstrate that either of the exceptions recognized in <u>Garmon</u> applies to their claims.  Accordingly, we conclude that the district court correctly dismissed Courts Eleven, Twelve, and Sixteen as preempted by the RLA.[8]

D.    <u>Plaintiffs' Claim of a Breach of the Duty of Fair Representation</u>

Plaintiffs submit that the district court erred in granting summary judgment in favor of APFA on the claim of a breach of the union's duty of fair representation.  We disagree.

---

[7] Plaintiffs cite several non-RLA cases to support their contrary argument, none of which is relevant to our analysis.  <u>See, e.g.</u>, <u>Sprietsma v. Mercury Marine</u>, 537 U.S. 51, 63 (2002) (construing the express preemption clause of the Federal Boat Safety Act of 1971 and concluding that it does not preempt common law claims); <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 495 (1996) (construing the express preemption provision of the Medical Device Amendments of 1976); <u>Freightliner Corp. v. Myrick</u>, 514 U.S. 280, 289 (1995) (construing preemption provision of National Traffic and Motor Vehicle Safety Act of 1966 and concluding that it did not preempt common law claim on issue for which federal law provided no standard).

[8] Plaintiffs also argue that the district court erred in concluding that the APFA constitution is not enforceable as a contract.  The court held no such thing.  Indeed, the court had no need to determine whether the constitution was enforceable as a contract because it dismissed the contract claim on a different ground, <u>i.e.</u>, that "[t]he allegations underlying plaintiffs' claim for "breach of the union constitution" are, in substance, identical to those in plaintiffs' DFR [duty of fair representation] claims" and are therefore preempted by the RLA.  <u>Marcoux v. Am. Airlines, Inc.</u>, --- F. Supp. 2d ---, 2008 WL 2828599, at *26. Because we affirm on that same ground, we need not address the enforceability issue.

1.      The Duty of Fair Representation Under the RLA

"The statutory duty of fair representation was developed [in the 1940s] in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act." Vaca v. Sipes, 386 U.S. 171, 177 (1967). In these cases, the Supreme Court ruled that "the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Id.; see Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers, 378 F.3d 269, 276 -77 (2d Cir. 2004). This "tripartite standard" applies to "'challenges leveled not only at a union's contract administration and enforcement efforts but at its negotiation activities as well,'" i.e., to both "major" and "minor" disputes under the RLA. Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 77 (1991) (quoting Communications Workers v. Beck, 487 U.S. 735, 743 (1988)).[9]

The Supreme Court has emphasized that a court's "substantive examination of a union's performance [is] highly deferential, recognizing the wide latitude that negotiators

---

[9] The district court properly identified this tripartite standard and fairly applied it in thoroughly reviewing the evidence relevant to plaintiffs' fair representation claim. See Marcoux v. Am. Airlines, Inc., 2008 WL 2828599, at *22-26. Thus, there is no merit to plaintiffs' argument that the award of summary judgment on this claim was infected by application of an incorrect legal standard. In any event, we review the challenged judgment de novo and conclude for ourselves that judgment was properly entered in favor of APFA.

26

need for the effective performance of their bargaining responsibilities." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. at 78. "For that reason, the final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a wide range of reasonableness that it is wholly irrational or arbitrary." Id. (internal citation and quotation marks omitted). The rationality of a union's decision must be evaluated "in light of both the facts and the legal climate that confronted the negotiators at the time the decision was made." Id. To demonstrate "bad faith" representation by a union, a party must show "improper intent, purpose, or motive." Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998) (observing that "[b]ad faith encompasses fraud, dishonesty, and other intentionally misleading conduct"). Even if a party makes such a showing, it must further demonstrate a causal connection between the union's misconduct and the complained-of injury. Id.

2.    Plaintiffs' Failure To Adduce Evidence of Irrational or Arbitrary Conduct

Plaintiffs point to numerous decisions taken by APFA in its negotiations with American Airlines that they submit raise triable issues of fact as to the irrationality and arbitrariness of the union's representation. See Fed. R. Civ. P. 56(c). We consider each in turn and conclude that plaintiffs' argument is without merit.

At the outset, we note that the record is replete with evidence that American Airlines was, in fact, in dire economic straits at the time the parties entered into the negotiations that

27

led to the Restructuring Participation Agreement. For example, American Airlines had a net loss of $3.5 billion in 2002, and by 2003 the airline was experiencing cash losses of approximately $5 million per day. Further, two of American Airlines' primary competitors, US Airways and United Airlines, had filed for bankruptcy protection in August 2002 and December 2002, respectively. These circumstances preclude any reasonable factfinder from concluding that APFA entered into the challenged negotiations with American Airlines irrationally, arbitrarily, or in bad faith.

Nor will the evidence admit an inference of arbitrariness or bad faith in the voting procedures used by APFA in seeking membership ratification of the Restructuring Participation Agreement. Plaintiffs take issue with the union's use of a telephonic balloting service provided by American Airlines rather than mail-in balloting, and with the use of a password supplied by American Airlines to monitor such balloting. Given the time-sensitive nature of the circumstances, APFA's reliance on telephonic balloting and its monitoring of the vote through a website established by American Airlines is insufficient, by itself, to permit a finding of bad faith.

Plaintiffs suggest that a jury could infer APFA's bad faith from its agreement to a ratification voting deadline of April 15, 2003, two days before American Airlines filed its 10K form revealing the terms of a Special Executive Retirement Plan. Plaintiffs failed, however, to adduce any admissible evidence supporting their conclusory assertion that APFA officials knew of the retirement plan when they agreed to the voting schedule. Indeed,

28

plaintiffs do not address testimonial evidence that APFA officials did not have any notice of the retirement plan until its public disclosure on April 17. This record is insufficient to demonstrate a genuine dispute of material fact warranting trial. See Fed. R. Civ. P. 56(c).

Plaintiffs further submit that APFA's decisions to extend the voting deadline to April 16 and to permit members to change votes were taken in bad faith. Once again, plaintiffs make a bald assertion – that "the principal, or sole, reason APFA did so was to reverse the [initial negative] outcome," Appellants' Br. at 42 – without pointing to any supporting admissible evidence. In fact, the record evidence demonstrates that APFA sought an extension through the end of April to provide its members with more time to consider the terms of the Restructuring Participation Agreement and to accommodate certain members who had had trouble casting votes. It was American Airlines that refused to agree to such an extension and, on April 15, offered the alternative of one further day of voting. There is no record evidence that would permit a factfinder to identify bad faith in APFA's acceptance of the one-day extension. See generally Parker v. Connors Steel Co., 855 F.2d 1510, 1521 (11th Cir. 1988) (finding no breach of the duty of fair representation where union urged ratification of collective bargaining agreement because it "accurately reflected its negotiation efforts with the Company and the economic crisis in the steel industry").

Like the district court, we also identify no record support for plaintiffs' claim that APFA acted arbitrarily or in bad faith in finalizing the April 25, 2003 acceptance of a modified Restructuring Participation Agreement. Following disclosure of the Special

29

Executive Retirement Plan, on April 22, 2003, APFA determined that the Restructuring Participation Agreement was no longer valid and would have to be put to a re-vote. The next day, a four-person congressional delegation met with various American Airlines officials, including CEO Donald Carty, APFA head John Ward, and the heads of two other unions that had ratified the Restructuring Participation Agreement. As a result of those discussions, American Airlines unilaterally acceded to several APFA demands, including a one-year reduction in the duration of the Restructuring Participation Agreement, an option for the union to reopen that Agreement after three years, and an "Annual Incentive Program." Plaintiffs do not dispute that these concessions benefitted APFA members. As a result of these discussions, American Airlines CEO Carty also resigned.

APFA leaders met with the new American Airlines CEO, Gerard Arpey, on April 24, 2003. The union requested that the airline defer filing for bankruptcy until after the re-vote, and it sought an additional amendment to the "underfly" provision of the Restructuring Participation Agreement. American Airlines agreed to remove the "underfly" provision and to substitute a different concession of equal value in its place, but it informed APFA that, if it did not finalize the Restructuring Participation Agreement by April 25, the airline would declare bankruptcy. The APFA Board of Directors considered this proposal and, on April 25, finalized the agreement. This record provides no support for plaintiffs' assertion that APFA's actions were "so far outside a wide range of reasonableness" as to be irrational. Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. at 78 (internal quotation marks omitted).

Accordingly, we conclude that summary judgment was appropriately entered in favor of APFA on plaintiffs' claim of breach of the duty of fair representation.

III.    **Conclusion**

To summarize, we conclude as follows:

1.  Plaintiffs' RLA claims against American Airlines pursuant to 45 U.S.C. § 152, First and Seventh were properly dismissed because those provisions do not provide a private cause of action for an employee against an employer.

2.  Plaintiffs' state law claims against American Airlines and APFA for breach of contract and intentional interference with contract were properly dismissed because these state law claims are preempted by the RLA.

3.  Summary judgment was properly entered in favor of APFA on plaintiffs' claim of breach of the duty of fair representation because plaintiffs failed to adduce evidence raising a colorable question of fact on the issue of whether APFA's actions were so far outside a wide range of reasonableness as to be wholly irrational, arbitrary, or undertaken in bad faith.

Accordingly, the judgment of the district court in favor of defendants is AFFIRMED.