**PMC, INC., Plaintiff,**

v.

**ATOMERGIC CHEMETALS CORPORATION, Defendant.**

**No. 93 Civ. 2881 (LBS).**

United States District Court, S.D. New York.

Feb. 23, 1994.

---

1.  All submissions of the parties will be deemed    resubmitted without the necessity of doing so.

Nixon, Hargrave, Devans & Doyle, New York City (Frank H. Penski, Robert C. Sentner and Matthew Tracy, of counsel), for plaintiff.

Wolfe & Yukelson, Port Washington, NY (Bruce Yukelson, of counsel), for defendant.

OPINION

SAND, District Judge.

This case concerns the arbitrability of a dispute arising out of an aborted 1989 chemi- cals sale. In December of 1989, plaintiff PMC, Inc. ("PMC") executed a "blanket pur- chase order" for approximately $15 million worth of chemicals from defendant Atomerg- ic Chemetals Corporation ("Atomergic"). The following month, a PMC representative signed a "confirmation of sale" form which contained a clause obliging the parties to submit subsequent disputes to arbitration. Further negotiations over a marketing agreement stalled, and only a very small amount of the chemicals was ever purchased. Three years later, pursuant to the arbitration clause, Atomergic served PMC with a De- mand for Arbitration before the American Arbitration Association, demanding payment of $6.6 million for the unsold chemicals. PMC responded by bringing this action, seeking a permanent stay of the arbitration and a declaratory judgment that no arbitra- tion agreement exists between the parties. The case presents us with a significant issue: whether a party that signs papers which appear on their face to be binding and which contain an arbitration clause, may be enti- tled, under the Federal Arbitration Act, U.S.C. Title 9, to a judicial determination of the contractual nature of the documents be- fore it is required to submit to arbitration of the dispute.

Atomergic has moved to dismiss the com- plaint, for summary judgment, and for a stay of this action pending arbitration. PMC cross-moved for a preliminary stay of arbi- tration. By Order dated July 26, 1993, we granted PMC's motion, staying arbitration pending further order of this Court. For the reasons set forth below, we now deny Ato- mergic's motion and determine that the mat- ter will proceed to trial.

BACKGROUND

PMC is a Delaware corporation with its principal place of business in California. Atomergic is a New York corporation with its principal place of business in New York. Both corporations are primarily engaged in the chemical business.

The central events triggering this litigation are not contested, although the parties differ strongly as to how they should be interpret-

ed. In 1989, Gordon McCullough ("McCullough") was general manager at a PMC plant in Cincinnati, Ohio, one of six facilities of the PMC Specialties Group, a division of PMC. In the spring of 1989, he read an article in a technical journal about an "aversive agent" known as Denatonium Saccharide ("DNS"), which was patented by Atomergic in 1985. An "aversive agent" is a substance added to poisonous products such as engine coolants to make them taste terrible and thus discourage children and animals from ingesting them. Atomergic notes that DNS is "the world's bitterest substance as certified by the Guinness Book of Records." Blum Aff. ¶ 4.

Although no market existed for DNS at the time, McCullough was nevertheless interested in the product for two reasons. McCullough Aff. ¶ 3. First, DNS contains saccharin, of which PMC is the only American manufacturer. Also, McCullough had learned that legislation was pending in Congress and in several states which would require the engine coolant industry to incorporate aversive agents into their products. If this legislation were to pass, a huge potential market for the product could be created.

A series of meetings ensued in the summer and fall of 1989 between McCullough and Melvin Blum ("Blum"), a vice president of Atomergic, to discuss the possibility that Atomergic could manufacture, and PMC could market, DNS. During these meetings, the parties attempted to estimate the potential market for DNS if the entire engine coolant industry were to incorporate DNS into their product. The parties agreed that Atomergic did not have the capacity to manufacture that large an amount of DNS—estimated at 60,000 pounds a year—and that it would need to line up "toll manufacturers" to meet this figure if the market ever developed. *Id.* ¶¶ 5–6.

Following these meetings, PMC and Atomergic attempted to negotiate a marketing agreement pursuant to which PMC would market, and Atomergic would manufacture and arrange for others to manufacture, DNS. Several drafts of a proposed agreement were exchanged in early 1990. *See id.* Exhs. A, B, C (January 4, March 2, and April 6 drafts).

It was during this period, in the course of negotiations over the marketing agreement, that the documents at issue in this litigation were executed. Atomergic claims that these documents—a "blanket purchase order" for 60,000 pounds of DNS (the "Purchase Order") and a "confirmation of sale" form (the "Confirmation of Sale"; collectively, the "Documents")—were binding contractual documents, which it now seeks to enforce; PMC claims that they were mere forms which the parties did not intend to have binding effect.

McCullough forwarded the Purchase Order to Blum in December of 1989. The Purchase Order, on a PMC preprinted form, was signed by Diana Grabo, PMC's purchasing agent. *See id.* Exh. D. It lists the quantity of purchase as "approx." 25,000 pounds "First Campaign," and 35,000 pounds "Second Campaign." Price is also listed as "approximate," and in the "DATE REQUIRED" box, "As released" has been filled in.

Blum responded by sending McCullough the Confirmation of Sale. This document, which is dated January 31, 1990 and signed by Blum, is a one-page order form preprinted by Atomergic, with boxes for order number, delivery date, F.O.B. location, terms, date, quantity, commodity, and price. *See id.* Exh. E. In the "QUANTITY" box is typed "60,000 lbs Annual contract," and in the "Delivery" box, "90 days after release." In the oversized box labelled "COMMODITY" is the arbitration clause under which Atomergic now demands arbitration.[1] Below the boxes describing the order of DNS, a box is checked next to the statement, "We accept order as described above." McCullough signed the Confirmation of Sale and returned it to Atomergic.

Following execution of these two documents, the parties continued to exchange letters and documents, and PMC applied for a trademark for DNS ("ReJeX-iT") and made a small (22–pound) purchase of DNS. *See* McCullough Aff. ¶¶ 7–12, 26; Blum Aff.

---

1. That clause reads: "Any controversies or claims arising out of or relating to this order shall be resolved by arbitration in NYC in accordance with the rules and regulations of the AAA."

¶¶ 14–20. The expected legislation, however, stalled, the market for DNS never developed as anticipated, and the proposed marketing agreement was never executed. McCullough Aff. ¶¶ 13. Three years later, in February 1993, Atomergic served PMC with a Demand for Arbitration, claiming that PMC had breached its obligations under the Purchase Order and Confirmation of Sale. PMC responded with this action, jurisdiction of which is founded on diversity.

## DISCUSSION

The underlying issue in this case is whether, through signing the Purchase Order and Confirmation of Sale, PMC entered into a legally binding contract with Atomergic and is thus bound by the arbitration clause in the Confirmation of Sale. This underlying question is not before us, however. Instead, we must consider the narrower question raised by Atomergic's motion: whether the question of the existence of a contract should be decided by this Court rather than an arbitrator; and, if so, whether PMC has raised issues of fact about the existence of the contract sufficient to defeat Atomergic's summary judgment motion. We conclude that the answer to both parts of this question is "yes." We then briefly consider two other arguments advanced by Atomergic, both of which we find meritless.

I.  *Who Should Determine Whether the Parties Entered into a Contract*

█ Atomergic contends that an arbitrator, rather than this Court, should determine whether the Purchase Order and Confirmation of Sale constitute a binding contract which obliges PMC to submit to arbitration. For this contention, Atomergic relies principally on two Supreme Court decisions—*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), and *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)—and

on cases in other circuits interpreting *Prima Paint.*

In *Prima Paint,* the Court, looking to § 4 of the Federal Arbitration Act, 9 U.S.C. § 4, concluded that a federal court must order arbitration *"once it is satisfied that 'the making of the agreement for arbitration ... is not in issue.'"* 388 U.S. at 403, 87 S.Ct. at 1806 (quoting 9 U.S.C. § 4) (emphasis added). It held, specifically, that while a court should itself examine a party's allegations that an *arbitration clause* was fraudulently induced ("an issue which goes to the 'making' of the agreement to arbitrate"), it should leave to the arbitrator any claims of fraudulent inducement of the contract as a whole, since "the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Id.* at 402–04, 87 S.Ct. at 1805–06.[2]

In *Moses H. Cone Hospital,* the Court reaffirmed *Prima Paint* and the "federal policy favoring arbitration" that it represented. 460 U.S. at 24, 103 S.Ct. at 941. A party to a contract had attempted to stay arbitration on the grounds that its opponent, through delay, had waived its right to enforce the contract. Applying the reasoning of *Prima Paint,* the Court ordered arbitration of the dispute. It concluded that:

> as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

*Id.* at 24–25, 103 S.Ct. at 941.

Atomergic cites cases, all from other circuits, which read narrowly *Prima Paint's* reference to "the making of the agreement for arbitration." *See, e.g., Teledyne, Inc. v. Kone Corp.,* 892 F.2d 1404, 1410 (9th Cir. 1989) (concluding that federal courts must send cases to arbitration "unless there is a challenge to the arbitration provision which

---

**2.** The litigation in *Prima Paint,* like the action we are considering, was initiated by the party seeking to avoid arbitration, and accordingly was not brought under § 4 of the Federal Arbitration Act, which governs actions to *compel* arbitration. Nevertheless, the Court concluded that the policy

of § 4 should control, since "it is inconceivable that Congress intended the rule to differ depending upon which party to the arbitration agreement first invokes the assistance of a federal court." 388 U.S. at 404, 87 S.Ct. at 1806.

is separate and distinct from any challenge to the underlying contract"); *Unionmutual Stock Life Ins. Co. v. Beneficial Life Ins. Co.,* 774 F.2d 524, 529 (1st Cir.1985) (same).

We do not need, however, to consider the various positions that other circuits have taken on this question, as the law within the Second Circuit is clear. The Second Circuit has concluded unequivocally that "the question of the very existence of the [contract] which embodies the arbitration agreement is encompassed within the meaning of 'the making of the arbitration agreement.'" *Interocean Shipping Co. v. National Shipping & Trading Corp.,* 462 F.2d 673, 676 (2d Cir. 1972), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *followed in A/S Custodia v. Lessin Int'l, Inc.,* 503 F.2d 318, 320 (2d Cir.1974); *Matter of Herlofson Mgmt. A/S v. Ministry of Supply,* No. 88 Civ. 7542 (RLC), 1989 WL 111083, at *3 (S.D.N.Y. Sept. 19, 1989).

■ The rationale supporting this approach is incontrovertible. As the Supreme Court has recently reaffirmed:

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration.

*AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648–49, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (citations omitted). Accordingly, before a party can be required to submit to arbitration, it is entitled to a judicial determination of the threshold question of whether it ever entered into an agreement which obliges it to consent to arbitration.

We do not think the Second Circuit's conclusion in *Interocean Shipping* has been disturbed by the Supreme Court's holding in *Moses H. Cone Hospital.* Neither in *Interocean Shipping* nor in the case before us did the challenge to the contract involve (as in *Moses H. Cone,* 460 U.S. at 25, 103 S.Ct. at 941) "the construction of the contract language itself or an allegation of waiver [or] delay." Instead, we are faced, as in *Intero-*

*cean,* with a challenge to "the very existence of the [contract] which embodies the arbitration agreement." *Interocean,* 462 F.2d at 676. We find the distinction significant, and we read *Prima Paint* and *Moses H. Cone,* as the Ninth Circuit has, as "limited to challenges seeking to *avoid* or *rescind* a contract—not to challenges going to the very existence of a contract that a party claims never to have agreed to." *Three Valleys Municipal Water Dist. v. E.F. Hutton & Co.,* 925 F.2d 1136, 1140 (9th Cir.1991) (emphasis in original).

## II. *Summary Judgment*

■ To qualify for a judicial determination of this issue, a party must provide "an unequivocal denial that the agreement had been made, and some evidence to substantiate the denial." *Interocean Shipping,* 462 F.2d at 676; *Almacenes Fernandez, S.A. v. Golodetz,* 148 F.2d 625, 628 (2d Cir.1945). PMC has satisfied this test. It has unequivocally denied that it entered into, or ever intended to enter into, a binding contract with Atomergic, and it has presented evidence to substantiate this position. This evidence raises issues of fact sufficient to defeat Atomergic's summary judgment motion.

PMC raises issues of fact with regard to two aspects of the contract: whether the Purchase Order and Confirmation of Sale were intended by either party to be binding contracts, and whether McCullough had authority to bind PMC.

First, PMC raises questions as to whether the parties intended the Purchase Order and Confirmation of Sale to bind them, or instead considered them "mere forms, intended never to become binding on the companies, and for that reason never contracts." *In re H. Hicks & Son,* 82 F.2d 277, 279 (2d Cir.1936) (L. Hand, J.). PMC's evidence going to this issue includes:

1) the Documents themselves, which contain words and phrases arguably inconsistent with an intent to bind (see McCullough Aff. ¶ 20 & Exhs. D & E);

2) PMC's affidavits regarding the behavior of the parties, including representations by

both parties that the Documents were not intended to be binding, evidence that the parties continued to negotiate a binding marketing agreement after the Documents were executed, and evidence that Atomergic never demanded performance of PMC's alleged obligations (*id.* ¶¶ 14–15, 19–22, 25–31; Grabo Aff. ¶¶ 2–3); and

3) PMC's affirmations regarding the practice of the chemical industry with regard to blanket purchase orders (McCullough Aff. ¶ 15; Grabo Aff. ¶¶ 2–3).

■ Second, PMC raises questions regarding McCullough's authority to bind PMC. As with the question of the parties' intentions, this is a question for the Court, not the arbitrator, to decide. *Interocean Shipping*, 462 F.2d at 677; *Matter of Herlofson Mgmt.*, 1989 WL 111083, at *3–4.

■ In order to bind a principal to a contract, an agent must have real or apparent authority to do so. *See Matter of Herlofson Mgmt. A/S v. Ministry of Supply*, 765 F.Supp. 78, 85–89 (S.D.N.Y.1991). PMC has presented evidence which puts into question whether McCullough had either kind of authority to bind PMC. With regard to express authority, PMC has presented evidence that McCullough was not an officer of PMC at the time he signed the Confirmation of Sale and thus, under PMC policy, was not authorized to enter into a contract on behalf of PMC. Johnson Aff. ¶ 2. As for apparent authority, PMC has presented evidence which puts into question whether Blum could have reasonably believed that McCullough was authorized to bind PMC to a $6.6 million contract. *See* McCullough Aff. ¶¶ 23–24.

### III. *Atomergic's Other Arguments*

Atomergic makes two other arguments—that PMC's action is time-barred, and that it is barred by the doctrine of "unclean hands." Both arguments are meritless.

The Federal Arbitration Act contains no statute of limitations. Atomergic contends, however, that in the absence of federal law in this area we should "borrow" New York's 20-day time bar on applications to stay arbitration, C.P.L.R. § 7503(c). For this proposition, Atomergic is able to cite only one case

from the federal courts, *Morgan v. Nikko Secur. Co. Int'l*, 691 F.Supp. 792 (S.D.N.Y. 1988) (applying C.P.L.R. § 7503(c) in case which originated in state court and was removed to federal court). This case, which originated in state court, is readily distinguishable from other authorities in this circuit, which are contrary to Atomergic's position. *See Sandvik, Inc. v. Libby*, 762 F.Supp. 596, 599 (S.D.N.Y.1991) (where a case arises under Federal Arbitration Act, federal rather than state time bar applies); *Rothberg v. Loeb, Rhoades & Co.*, 445 F.Supp. 1336, 1339 (S.D.N.Y.1978) (same). Moreover, as Atomergic concedes (D's Mem. at 17–18), the New York provision is only applicable where an agreement to arbitrate exists. Since we leave the determination of that question to a later stage of these proceedings, we do not need to address Atomergic's argument at this time.

Atomergic's final argument, that PMC's action is barred by the doctrine of "unclean hands," is based on a disingenuous mischaracterization of PMC's claims. Atomergic contends (D's Mem. at 21) that PMC has conceded its own fraudulent conduct in this matter—that it claims in its Complaint "that it executed a purchase order for the sole purpose of deceiving certain manufacturers into believing that ATOMERGIC had obtained an order of over $11,000,000.00 worth of chemical products." Needless to say, PMC does not characterize its behavior as fraudulent, and Atomergic presents no evidence that would support such an interpretation. *See* Complaint ¶¶ 14–16; McCullough Aff. ¶ 15 (purpose of Purchase Order and Confirmation of Sale was to show manufacturers PMC's interest in marketing DNS, not that it had entered into a contract, and practice is accepted in the chemical industry). Accordingly, the "unclean hands" argument is baseless.

### CONCLUSION

■ For the reasons set forth above, Atomergic's motion to dismiss or stay this action is denied. The case will proceed to trial on the sole issue of whether the Purchase Order and Confirmation of Sale constitute a binding contract obligating PMC to submit to arbi-

tration. If this is determined to be the case, the matter will proceed to arbitration; if not, the matter will be concluded. The case will be tried before a jury unless the parties inform the Court that they consent to an expedited proceeding before the Court or a magistrate.[3]

Within 20 days of the date of this Opinion, the parties are to inform the Court in writing of the date by which the remaining discovery, if any, will be completed, when they will submit a joint pretrial order, and when they will be ready for trial.

Motion denied.

SO ORDERED.

---

3. PMC has demanded a jury, and pursuant to § 4 of the Federal Arbitration Act it is entitled to one. This is so even though the action was not brought under § 4, which governs actions to compel arbitration, but was brought instead by PMC seeking a stay of arbitration. *See Prima Paint*, 388 U.S. at 404, 87 S.Ct. at 1806 (policy of § 4 is not confined to actions brought under that section but is applicable more generally to actions concerning arbitrability, since "it is inconceivable that Congress intended the rule to differ depending upon which party to the arbitration agreement first invokes the assistance of a federal court").