In re AMR CORPORATION, et al., Debtors.

Supplement B Pilot Beneficiaries, Appellants,

v.

AMR Corporation and American Airlines, Inc., Appellees.

Nos. 11–15463(SHL), 12 Civ. 7800(CM), 13 Civ. 958(CM), 13 Civ. 959(CM).

United States District Court, S.D. New York.

Signed Oct. 17, 2014.

Todd Clifford Duffield, Neil D. Mollen, Paul Hastings LLP, Stephen Karotkin, Weil, Gotshal & Manges LLP, New York, NY, Albert L. Hogan, III, Skadden, Arps, Slate, Meagher & Flom, LLP, Chicago, IL, Gary M. Ford, Lonie A. Hassel, Edward A. Scallet, Julia E. Zuckerman, Groom Law Group, Washington, DC, for Appellees.

Stanley J. Silverstone, Seham Seham Meltz & Petersen, White Plains, NY, for Appellants.

## MEMORANDUM DECISION AND ORDER AFFIRMING ORDERS OF THE BANKRUPTCY COURT

McMAHON, District Judge.

These consolidated appeals arise from the bankruptcy of American Airlines ("American") and its parent corporation, AMR. The appellants are a group of current pilots nearing retirement ("B Pilots"). The B Pilots appeal orders of the bankruptcy court: (1) authorizing American to reject its collective bargaining agreement ("CBA") with the American Pilots Association ("Pilots Union"); (2) approving a new CBA between American and the Pilots Union that purported to settle the B Pilots' outstanding grievances against American; and (3) authorizing American to amend its pension plan by eliminating lump-sum payouts.

For the reasons stated below, the orders of the bankruptcy court are **AFFIRMED.**

## BACKGROUND

American filed its petition for bankruptcy under Chapter 11 of the Bankruptcy Code on November 29, 2011. *See* Voluntary Petition (Chapter 11), *In re AMR Corp.*, No. 11–15463 (Bankr.S.D.N.Y. Nov. 29, 2011) Docket # 1. The petition followed a decade of consecutive annual losses totaling over $10 billion. *In re AMR Corp.*, 477 B.R. 384, 397 (Bankr.S.D.N.Y. 2012). American lost market share as well as money, both to other network carriers—large airlines that predate airline deregulation and generally operate on a "hub

and spoke" model—and to emerging low-cost carriers. *Id.* at 397–98.

Although American's financial woes had many causes, high labor costs played a significant role. *Id.* at 399–400. American had higher labor costs per available seat-mile than any of its major competitors, even while its workforce was less productive. *Id.* These high labor costs, exacerbated by the high percentage of secured debt American carried, prevented the airline from modernizing its fleet and making other important investments. *Id.* at 397–99. Indeed, labor costs were, on the eve of bankruptcy, American's largest controllable cost. *Id.* at 399 & n. 4.

Seventy percent of American's workforce is unionized, so American's high labor costs were driven in significant part by CBAs between it and three unions: the Transit Workers Union of America ("TWU"), the American Professional Flight Attendants ("APFA"), and the Pilots Union. *Id.* at 395, 404.

One provision of the pre-bankruptcy CBA is particularly pertinent to this appeal. That provision, Supplement B, has existed since 1983, when American faced an earlier financial crisis. *Id.* at 450. In exchange for making pay and benefits concessions, the pilots hired before November 1, 1983 obtained a guarantee that American would "take no action, at any time, by way of notice, negotiations or otherwise, to diminish the pay or the retirement programs" to which those pilots had agreed. *See* B Pilots' Objection to Motion, Exhibit B § B.1, *In re AMR Corp.*, No. 11–15463 (Bankr.S.D.N.Y. Apr. 3, 2012) Docket # 2134. The B Pilots argue that Supplement B's guarantees were permanent and modifiable only through mutual consent.

After filing its bankruptcy petition, American successfully renegotiated its CBAs with the TWU and the APFA. *AMR Corp.*, 477 B.R. at 405; *see* Ameri-

can's Motion to Authorize Entry into a New CBA With the APFA, *In re AMR Corp.*, No. 11–15463 (Bankr.S.D.N.Y. Aug. 24, 2012) Docket # 4161. The Pilots Union, however, voted against a proposed CBA. *AMR Corp.*, 477 B.R. at 405. American thus moved to reject its CBA with the Pilots Union under 11 U.S.C. § 1113. *See* American's Motion to Reject CBAs, *In re AMR Corp.*, No. 11–15463 (Bankr.S.D.N.Y. Mar. 27, 2011) Docket # 2035.

Following a three-week trial, the bankruptcy court denied the motion. *AMR Corp.*, 477 B.R. at 393, 454. It held that American had satisfied most of the prerequisites to rejecting a CBA under § 1113, but that the airline failed to show two modifications in its proposed CBA were "necessary" as § 1113 section requires. *Id.* at 454. American thereafter modified its proposal and filed a renewed motion, which the bankruptcy court granted. *See* American's Renewed Motion to Reject CBAs, *In re AMR Corp.*, No. 11–15463 (Bankr.S.D.N.Y. Aug. 17, 2012) Docket # 4084; Order Authorizing Rejection of Pilots Union CBA, *In re AMR Corp.*, No. 11–15463 (Bankr.S.D.N.Y. Sept. 5, 2012) Docket # 4293.

The B Pilots appeal from that order, raising a variety of statutory and contractual arguments why American could not reject the pre-bankruptcy CBA with the Pilots Union.

After American rejected its CBA with the Pilots Union it moved to modify its pension plan for pilots by eliminating an option to receive lump-sum payment of pension benefits upon retirement. American's Motion to Authorize Pension Plan Modifications, *In re AMR Corp.*, No. 11–15463 (Bankr.S.D.N.Y. Nov. 23, 2012) Docket # 5413. While that payment option was automatically suspended by statute during the pendency of the bankrupt-

cy, see IRC § 436(d)(2), American argued that it would face a financially crippling wave of pilot retirements if the option were renewed once it emerged from Chapter 11. See American's Memorandum in Support of Motion to Authorize Pension Plan Modifications, In re AMR Corp., No. 11–15463 (Bankr.S.D.N.Y. Nov. 23, 2012) Docket # 5414; Hearing Tr. of Dec. 19, 2012 at 70, In re AMR Corp., No. 11–15463 (Bankr.S.D.N.Y. Jan. 7, 2013) Docket # 6282. The bankruptcy court granted this motion as well, see Order Approving Pension Plan Modifications, In re AMR Corp., No. 11–15463 (Bankr.S.D.N.Y. Dec. 19, 2012) Docket # 5797, and the B Pilots—all of whom are nearing retirement—appeal.

Finally, American asked for the bankruptcy court to approve a new CBA with the Pilots Union. See American's Motion to Authorize Entry into a New CBA With the Pilots Union, In re AMR Corp., No. 11–15463 (Bankr.S.D.N.Y. Dec. 7, 2012) Docket # 5626. The new CBA settles all outstanding grievances by members of the Pilots Union, including those grievances brought by the B Pilots concerning Supplement B's guarantees. Hearing Tr. of Dec. 19, 2012 at 13–14. The B Pilots appeal from the bankruptcy court's order approving the new CBA.

Initially, an appeal by a separate group of disaffected pilots was also consolidated with the B Pilots' appeals. See Am. Indep. Cockpit Alliance v. AMR Corp., No. 13–cv–1097 (S.D.N.Y.). The parties stipulated to voluntary dismissal of that appeal under FED. R. BANKR. P. 8001(c)(2). See Stipulation and Order of Dismissal, Am. Indep. Cockpit Alliance v. AMR Corp., No. 13–cv–1097 (S.D.N.Y. Oct. 17, 2014).

## DISCUSSION

### I. Standard of Review.

■ "Generally in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo." In re Charter Commc'ns, Inc., 691 F.3d 476, 482–83 (2d Cir.2012); see FED. R. BANKR. P. 8013. For non-core proceedings, however, in which the Constitution prohibits bankruptcy courts from entering final judgments without party consent, district court review is plenary. See Executive Benefits Ins. Agency v. Arkison, —— U.S. ——, 134 S.Ct. 2165, 2172, 189 L.Ed.2d 83 (2014).

■ Because the orders under review in this appeal arose in a title 11 case, rather than an adversary proceeding, they are core proceedings subject to traditional appellate review. See 28 U.S.C. § 157(b)(2)(A) & (O); In re UAL Corp., 408 F.3d 847, 849 (7th Cir.2005); In re Chicago Const. Specialties, Inc., 510 B.R. 205, 209–10 (Bankr.N.D.Ill.2014). "The Court may affirm on any ground that finds support in the record, and need not limit its review to the bases raised or relied upon in the decisions below." Freeman v. Journal Register Co., 452 B.R. 367, 369 (S.D.N.Y.2010).

### II. The Supplement B Pilots Are Not An "Interested Party" And So May Not Object To American's Motion To Reject Its CBA With The Pilots Union.

■ American moved to reject the old Pilots Union CBA under § 1113 of the Bankruptcy Code. The bankruptcy court implied, but did not hold, that the B Pilots were not permitted to object to that motion. AMR Corp., 477 B.R. at 452–53. Though the bankruptcy court and the parties have referred to this as a "standing" argument, the Supreme Court has admonished against using the term "standing" outside the context of Article III. See Lexmark Int'l, Inc. v. Static Control Com-

*ponents, Inc.,* —— U.S. ——, 134 S.Ct. 1377, 1386–88, 188 L.Ed.2d 392 (2014). That concern is founded here, where the argument is one of statutory construction: § 1113 permits only "interested parties" to be heard in a proceeding to reject a CBA. 11 U.S.C. § 1113(d)(1). The question, then, is whether the B Pilots are an "interested part[y]."

The Code does not define "interested part[y]" and there is little case law doing so. There are, however, several reasons to believe that phrase does not include the B Pilots.

■ First, the purpose of " § 1113, is to force a Chapter 11 debtor to negotiate with a union in a good faith manner." *In re Sierra Steel Corp.,* 88 B.R. 337, 341 (Bankr.D.Colo.1988). For example, § 1113 requires debtors to "make a proposal to the authorized representative" for modifying an existing CBA and provide "relevant information" so the representative can evaluate the proposal. *Id.* § 1113(b)(1). The debtor must then "meet . . . with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications" to the CBA. *Id.* § 1113(b)(2). A debtor may only reject a prior CBA after the authorized representative refuses its proposal "without good cause." *Id.* § 1113(c)(2). The section, in other words, establishes a central role for a union and the debtor, but not for disaffected groups within the union.

■ Second, allowing individual union members or subsets of the union to participate in negotiations over a CBA is contrary to federal labor policy. Federal labor policy embodies a quid-pro-quo exchange: employees give up their right to negotiate individual terms and conditions of employment in return for a promise by the union to represent their interests. *N.L.R.B. v. Allis–Chalmers Mfg. Co.,* 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); *Lindsay v. Ass'n of Prof'l Flight Attendants,* 581 F.3d 47, 55 (2d Cir.2009). Employers similarly renounce their right to bargain with individual employees. Indeed, the Supreme Court has held that the employer's duty to bargain with a union includes a negative duty not to bargain with any organization other than the employees' exclusive representative. *Medo Photo Supply Corp. v. N.L.R.B.,* 321 U.S. 678, 683–84, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).

Section 1113, rejecting a prior Supreme Court opinion to the contrary, *see N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 533, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), extends the duty to bargain into at least the early stages of bankruptcy. Yet the B Pilots claim that American had to bargain *with them* in good faith and consider their interests separate and apart from the Pilots Union. Had American done so, it may well have violated the Railway Labor Act. *Ruby v. Am. Airlines, Inc.,* 329 F.2d 11, 20–21 (2d Cir.1964), *vacated as moot sub nom. O'Connell v. Manning,* 381 U.S. 277, 85 S.Ct. 1456, 14 L.Ed.2d 430 (1965). And at the very least, the request to accommodate individuals and subsets of the union runs contrary to a fundamental precept of federal labor policy that the union, as exclusive bargaining representative, has broad discretion to balance the interests of competing groups of employees. *See Humphrey v. Moore,* 375 U.S. 335, 349, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); *Jones v. Trans World Airlines, Inc.,* 495 F.2d 790, 798 (2d Cir.1974).

Third, allowing a subset of the union to object independently to a contract negotiated by the union on behalf of all its members would throw a wrench into § 1113 proceedings. Doing so would invite every small group, from employees who work the night shift to pilots based in specific cities, to argue in favor of particu-

lar provisions, thereby greatly decelerating reorganization. *AMR Corp.*, 477 B.R. at 452; *see In re UAL Corp.*, 408 F.3d 847, 851 (7th Cir.2005). That result contravenes the Bankruptcy Code's goal of quickly reorganizing Chapter 11 debtors, *In re Refco Inc.*, 505 F.3d 109, 118–19 (2d Cir.2007); *In re Genesis Health Ventures, Inc.*, 280 B.R. 339, 346 (D.Del.2002). On this basis, the Seventh Circuit Court of Appeals has already concluded, in the context of a competitor airline's bankruptcy, that peripheral parties such as the B Pilots are not "interested parties" under § 1113. *UAL Corp.*, 408 F.3d at 851.

The B Pilots argue against this "slippery slope" concern by noting that no other group has what they consider to be an unalterable and permanent job security guarantee. But that guarantee constitutes the substance of the B Pilots' objection— not the basis for their right to participate. There is simply no principled argument for interpreting "interested parties" to include the debtor, the union, and subsidiary groups of union members with special interests.

When the B Pilots do address the meaning of the phrase "interested parties," they propose a far broader interpretation. The B Pilots suggest that the phrase "interested parties" should be interpreted the same way as a "party in interest" in 11 U.S.C. § 1109(b). Courts have broadly construed "party in interest" to include entities with "a pecuniary interest that will be directly affected by the case." *In re Innkeepers USA Trust*, 448 B.R. 131, 141 (Bankr. S.D.N.Y.2011); *see In re PlusFunds Grp., Inc.*, 505 B.R. 419, 425 (S.D.N.Y.2014).

But it was settled long ago that the term "party in interest" is not as broad as the B Pilots assert. Second Circuit doctrine defining the term actually cuts in favor of American. In *Refco*, for example, an investment company placed a great deal of

capital with the debtor. 505 F.3d at 111–12. On the eve of bankruptcy, the debtor transferred the money back to the investment company; in bankruptcy it sought to avoid that transaction. *Id.* at 112–13. The two parties ultimately settled and the investors—who suffered a significant financial loss when most of the money was returned—sued. *Id.* They argued that the bankruptcy court should not have approved the settlement, as it was a product of collusion among the debtor, various intermediaries, and the investment company. *Id.* at 113.

The Second Circuit held that the investors were not a proper "party in interest" with a right under § 1109(b) to object to the settlement. *Id.* at 117. First, the court noted that the dispute before it was essentially an argument about breach of fiduciary duty between the investment company and its investors, whereas the bankruptcy court was a forum "where creditors and debtors can settle their disputes *with each other.*" *Id.* at 117–18. Second, the court explained that "facile" standards for participation under § 1109(b) could "over-burden the reorganization process by allowing numerous parties to interject themselves into the case on every issue, thereby thwarting the goal of a speedy and efficient reorganization." *Id.* at 118 (quoting *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 850–51 (Bankr.S.D.N.Y. 1989)); *see also Innkeepers USA Trust*, 448 B.R. at 144–45.

So too here. The B Pilots style their claim as an objection under § 1113, but their real complaint is that the union compromised their interests during American's bankruptcy. The B Pilots do little to conceal that fact; they even state that they have fair representation claims which can be litigated in another forum. *See* B Pilots' § 1113 Br. 14 & n. 6, 25–27. Just as an internal dispute between a creditor and

its investors is peripheral to settling creditor-debtor disputes, so too is settling an intra-union dispute among workers peripheral to resolving union-debtor disputes under § 1113. As explained above, the *Refco* court's concerns about delaying reorganization also apply to the B Pilots' objection.

### III. The Bankruptcy Court Properly Authorized American to Amend Its Pension Plan.

█ The B Pilots argue that the bankruptcy court could not authorize any pension plan amendments because of Supplement B's permanent guarantees. But the bankruptcy court correctly held that once the old CBA was rejected, those guarantees were no longer binding. *AMR Corp.*, 477 B.R. at 453; Hearing Tr. of Dec. 19, 2012 at 75–76. The old CBA itself was the source of those permanent guarantees. When the old CBA was abrogated, the guarantees no longer bound American. Although that result makes the CBA's permanent guarantees less than permanent in practice, it is exactly what the Bankruptcy Code contemplates. *AMR Corp.*, 477 B.R. at 453; *see In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 87 (2d Cir.1992).

█ The B Pilots also argue that the bankruptcy court erred by finding that a lump-sum payment option would trigger a wave of pilot retirements. Hearing Tr. of Dec. 19, 2012 at 70–71. But American, with the agreement of the Pension Benefit Guaranty Corporation, has the better of the argument.

Before bankruptcy, nearly all pilots chose the lump-sum payout upon retirement. American argues that if pilots feared that option might become unavailable in the future, they might opt to retire as soon as American emerged from bankruptcy in order to reap the lump sum. The B Pilots' arguments—essentially quibbling about past retirement rates—do not demonstrate the "clear error" required to reverse the bankruptcy court's finding. *Charter Commc'ns*, 691 F.3d at 482–83.

█ Finally, the B Pilots argue that they alone constitute a small subset of American pilots and that lump-sum payments could be preserved as to them only, while freezing payouts for other pilots. I join Judge Hardin in rejecting this "last man standing" argument. Accepting the B Pilots' reasoning would make it impossible for any debtor to succeed in making changes in the face of individual or small-group objections, and it is contrary to § 1113's goal of equal sacrifice by all parties. *In re Delta Air Lines*, 342 B.R. 685, 693–94 (Bankr.S.D.N.Y.2006).

### IV. The Bankruptcy Court Properly Held the B Pilots' Grievances Do Not Survive Rejection of the Old CBA.

█ The new CBA purports to settle outstanding pilot grievances without arbitration, and in particular to extinguish any grievances brought by the B Pilots concerning Supplement B. The bankruptcy court held that these grievances were extinguished because the old CBA, including supplement B, was rejected. Hearing Tr. of Dec. 19, 2012 at 76. That conclusion is correct. By rejecting the old CBA under § 1113, American did not merely breach the agreement, it "abrogate[d]" it. *In re Nw. Airlines Corp.*, 483 F.3d 160, 172 (2d Cir.2007). Rejection under § 1113 eliminated the obligations the CBA created on both parties, and allowed American to create new conditions "without fear of liability." *Id.* at 170–73.

The B Pilots do not so much contest this reasoning, as argue instead that the bankruptcy court had no power to apply it. They argue that under the Railway Labor Act, the grievances filed by the B Pilots—

which concern enforcement of Supplement B—are subject to the exclusive jurisdiction of "adjustment boards," *see* 45 U.S.C. § 184, so the issues of mootness and abrogation may only be decided by an arbitrator.

The B Pilots are correct that the adjustment boards have exclusive jurisdiction over many grievances arising out of CBAs. But that is not the whole story. Although federal law, including federal labor law, favors arbitration of disputes, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Thus, "the question of arbitrability—whether a collective—bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination." *Id.* at 649, 106 S.Ct. 1415. The same principle applies when a party calls into question the very existence or validity of an agreement compelling arbitration. A party "is entitled to a judicial determination of the threshold question of whether it ever entered into an agreement which obliges it to consent to arbitration." *PMC, Inc. v. Atomergic Chemetals Corp.*, 844 F.Supp. 177, 181 (S.D.N.Y.1994) (citing *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir.1972)).

The bankruptcy court here properly addressed just that "threshold question." Any duty to arbitrate arose from the old CBA. The bankruptcy court correctly held that American was not under any duty to arbitrate its grievances once it rejected that contract.

## CONCLUSION

For the foregoing reasons, the orders of the bankruptcy court are **AFFIRMED**.